[No. B235448. Second Dist., Div. Four. Jan. 22, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID NAVARRO, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts C., D., E., and F. under the heading "Discussion."

## COUNSEL

Helen Simkins Irza, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MANELLA, J.**—Appellant David Navarro was convicted of a number of charges related to shooting at a cohabitant from outside their mutual dwelling and evading arrest. On appeal, he contends (1) his conviction of assault with a firearm was not supported by substantial evidence; (2) the statute under which he was convicted of dissuading a witness violates the First Amendment and is fatally uncertain or vague; (3) the instructions given to define the offense of dissuading a witness did not save it from unconstitutionality; (4) by allowing testimony to be read to the jurors in the jury room, the trial court violated his constitutional and statutory rights to be present during all critical phases of trial and to a public trial; and (5) his presentence custody credits were miscalculated. He also seeks review of the trial court's in camera review of documents produced in response to his *Pitchess* motion.[1] In the published portion of the opinion, we reject his challenge to the sufficiency of the evidence and his constitutional challenge to Penal Code section 136.1, subdivision (b)(1).[2] In the unpublished portion, we correct the judgment to reflect the proper custody credits, but otherwise reject his challenges and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

#### A. *Information*

Appellant was charged by information with attempted murder (§ 1192.7, subd. (c); count one); assault with a semiautomatic firearm (§ 245, subd. (b); count two); shooting at an inhabited dwelling (§ 246; count three); corporal injury to a cohabitant (§ 273.5, subd. (a); count four); child abuse (§ 273a, subd. (a); counts five and six); preventing or dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1); count seven); evading an officer (Veh.

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305].

[2] Undesignated statutory references are to the Penal Code.

Code, § 2800.2, subd. (a); count eight) and negligent discharge of a firearm (Pen. Code, § 246.3, subd. (a); count nine).[3] With respect to counts one, two, and six, it was further alleged that appellant personally used and/or discharged a firearm within the meaning of sections 12022.5, and/or 12022.53, subdivisions (b) and (c), causing the offenses to become serious felonies under sections 667.5, subdivision (c), and 1192.7, subdivision (c).

### B. Evidence at Trial

Appellant had been living with Liseth Acosta for 10 years. They had two children. The family moved to Palmdale in 2009, where they lived with Acosta's mother. After losing his job due to an injury some years earlier, appellant had been unable to find stable employment, which caused him to be depressed and led the couple to quarrel.

On January 20, 2010, Acosta walked into the master bedroom, where appellant and the two children were lying on the bed watching television. Appellant had been drinking. Acosta went into the closet, appellant followed, and the two argued about some revealing underwear Acosta had purchased. Appellant "head-butted" Acosta, injuring the area around her eye.[4]

Acosta told appellant to leave, but he refused. Using a cordless phone, Acosta called the sheriff's department. She told the operator that appellant had "butted [her] in the head" and refused to leave.[5] The operator promised to send a deputy and told her to stay on the line. Appellant grabbed the phone from Acosta, took the battery out and put the phone in the closet. He then walked through the laundry room, into the garage, and out toward his car in the driveway. Acosta followed and told appellant to give her the house keys. Appellant ignored her, while appearing to look for something in his car. After a brief period, Acosta walked back into the house through the laundry room, closing and locking the door behind her. As she left the laundry room, she heard a gunshot and a bullet passed through the door she had just closed.[6]

---

[3] Former count eight for possession of a firearm by a felon (former § 12021, subd. (a)(1)) was dismissed prior to trial, and former counts nine and 10 were renumbered as specified above.

[4] At trial, Acosta testified they accidentally butted heads when she reached for the underwear, which was in a clear plastic bag on the floor of the closet. But in a call to the sheriff's department and in interviews with deputies later that day, she complained of being "head-butted" by appellant without suggesting it was accidental. At the preliminary hearing, Acosta testified that appellant "head butted [her] in [her] right eye" after they argued about the underwear.

[5] A recording of the call was played to the jury.

[6] At trial, Acosta testified she had entered the hallway and was near the front door when the shot was fired. On the day of the incident, she told Deputy Conley that she had just shut the door from the garage to the laundry room and turned to walk away when she heard the gunshot.

Acosta called the children and her mother into the kitchen and told them to get down on the floor, while she called 911 using her cell phone.[7] She reminded the operator she had called earlier and stated "he has a gun now" and was "shooting something." She said, "[P]lease hurry up, he's coming . . . I think he's trying to come through the back now. I think he's drinking. . . ." "He's trying to come back inside the house." While she was on the line with the operator, appellant called and told her to call and tell the deputies that "everything is fine." She told him to turn himself in because she was not going to lie.

Shortly thereafter, Deputy Christopher Conley arrived and interviewed Acosta. Acosta said appellant "head-butted" her, indicating "that it was very intentional." The deputy observed redness and swelling near Acosta's right eye.

J.G., a teenager who lived across the street, heard a loud noise and looked out his bedroom window. He saw appellant standing in the driveway near the garage. As J.G. was watching, appellant shot into the garage. Appellant then walked back and forth nervously, going into and out of the garage and around the side of the house. J.G. saw a woman peer out of a window of the house. Appellant fired a shot toward the sky. After moving around nervously for a bit longer, getting into and out of his car and starting and turning off the engine, appellant drove away.

Because Acosta had provided a description of appellant's car during the 911 call, deputies were able to locate and identify him driving on a nearby highway. Appellant ignored instructions to pull over and was arrested in Anaheim after a chase lasting more than an hour at speeds of up to 90 miles per hour.[8]

Deputies found two expended cartridges in the driveway. The cartridges were from a .380 automatic handgun. When arrested, appellant had gunshot residue on his hands. Deputies found no gun in the car, but the passenger window, which had been intact when the chase started, was broken from the inside.

Appellant did not testify and presented no evidence.

The bullet passed through the door between the laundry room and the garage, then passed through the laundry room wall into an adjacent bedroom, coming to rest behind the door to the bedroom.

[7] A recording of the 911 call was played to the jury.

[8] This appeal raises no issues pertaining to the chase or the related charge.

C. *Verdict and Sentencing*

The jury found appellant not guilty of attempted murder (count one). It found him guilty of assault with a semiautomatic firearm (count two), shooting at an inhabited dwelling (count three), witness intimidation (count seven), evading an officer (count eight), and negligent discharge of a firearm (count nine). With respect to counts four (corporal injury to a cohabitant), five and six (child endangerment), the jury found appellant guilty of the lesser included offenses of battery against a child's parent (§ 243, subd. (e)(1)) and willful cruelty to a child (§ 273a, subd. (b)). With respect to count two, the jury found true that appellant personally used a firearm within the meaning of section 12022.5, subdivision (a).

The court sentenced appellant to a term of 21 years in state prison. The sentence consisted of 19 years on count two (the upper term of nine years, plus 10 years for the § 12022.5, subd. (a) firearm enhancement), a concurrent five-year term on count three, a concurrent one-year term on count four, concurrent six-month terms on counts five and six, a consecutive two-year term on count seven, and concurrent two-year terms on counts eight and nine. Appellant received 538 days of presentence custody credits.

## DISCUSSION

A. *Assault: Sufficiency of the Evidence*

Appellant contends there was insufficient evidence to show he had the necessary mental state to commit assault because the prosecution presented no evidence that he had actual knowledge that a bullet shot at a door would penetrate it and threaten a person standing on the other side. Appellant misperceives the prosecution's burden, which was met when substantial evidence established that he knowingly committed acts which resulted in physical force being applied toward the victim which a reasonable person would know was likely to result in injury.

 Section 240, enacted in 1872, defines assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." The necessary mens rea to support assault was set forth in *People v. Williams* (2001) 26 Cal.4th 779, 787–788 [111 Cal.Rptr.2d 114, 29 P.3d 197]: "Based on the 1872 definition of attempt, a defendant is only guilty of assault if he intends to commit an act 'which would be indictable [as a battery], if done, either from its own character or that of its natural and probable consequences.' [Citation.] Logically, a defendant cannot have such an intent unless he actually knows those facts sufficient to establish that his act by its nature will probably and directly result in physical force being applied to

another, i.e., a battery. [Citation.] In other words, a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct. He may not be convicted based on facts he did not know but should have known. He, however, need not be subjectively aware of the risk that a battery might occur." (Quoting 1 Bouvier's Law Dict. (1872) p. 166.) With respect to its final point, the court further stated: "[A] defendant who honestly believes that his act was not likely to result in a battery is still guilty of assault if a reasonable person, viewing the facts known to defendant, would find that the act would directly, naturally and probably result in a battery." (*People v. Williams, supra*, 26 Cal.4th at p. 788, fn. 3.)

That appellant's knowingly undertaken acts meet the *Williams* standard is made clear by the holding in *People v. Wyatt* (2010) 48 Cal.4th 776 [108 Cal.Rptr.3d 259, 229 P.3d 156]. There, the defendant's 14-month-old son died of internal injuries after a bout of "play-fighting" with the defendant, who claimed to have had no actual knowledge he was wrestling far too hard with his son. (*Id.* at pp. 783, 785.) After being found guilty of assault on a child causing death under section 273ab, the defendant raised a contention similar to appellant's—that the evidence was insufficient to prove the requisite mens rea for assault because he was unaware that the force he was using could seriously injure the victim. The court explained that under *Williams*, "a defendant may be guilty of an assault . . . if he acts with awareness of facts that would lead a reasonable person to realize that great bodily injury would directly, naturally, and probably result from his act. [Citation.] The defendant, however, need not know or be subjectively aware that his act is capable of causing great bodily injury. [Citation.] This means the requisite mens rea may be found even when the defendant honestly believes his act is not likely to result in such injury." (*People v. Wyatt, supra*, 48 Cal.4th at p. 781.) Because the defendant "knew he was striking his young son with his fist, forearm, knee, and elbow, and that he used an amount of force a reasonable person would realize was likely to result in great bodily injury," the evidence was sufficient to support the conviction. (*Id.* at p. 779.)

█ Here, substantial evidence established that after quarreling with Acosta and being told to leave, appellant went to his car, removed a loaded gun—a .380 according to ballistics—and fired a bullet at the door through which Acosta had just walked. This met the prosecution's burden to establish that appellant "knew . . . that he used an amount of force a reasonable person would realize was likely to result in great bodily injury" (*People v. Wyatt, supra*, 48 Cal.4th at p. 779) or that he "act[ed] with awareness of facts that would lead a reasonable person to realize that great bodily injury would directly, naturally, and probably result from his act" (*id.* at p. 781). The jury was correctly instructed that in order to prove the assault, the evidence must establish, among other things, that "[a] person willfully committed an act

which by its nature would probably and directly result in the application of physical force on another person" and that "[t]he person committing the act was aware of facts that would lead a reasonable person to realize that as a direct, natural and probable result of this act that physical force would be applied to another person." (See *People v. Albritton* (1998) 67 Cal.App.4th 647, 658 [79 Cal.Rptr.2d 169] [whether force applied by defendant was objectively likely to result in great bodily injury was question of fact for jury].) The jury's conclusion that a reasonable person would understand that the closed laundry room door would pose no serious barrier to a bullet fired from a position just outside the garage was a reasonable one.

Appellant contends that in the absence of a showing that he possessed some expertise in the use of firearms, the jury could not infer he had the requisite intent. We disagree. It requires neither special expertise nor even personal familiarity with firearms to know that guns propel bullets at great speed and force, often penetrating walls and other architectural barriers. There was no evidence defendant thought the gun was a toy or was otherwise incapable of expelling real bullets. Acosta's testimony that to her knowledge defendant had never shot a weapon was probative only of her own ignorance, as she admitted being unaware appellant even possessed a gun. Nor did appellant's own behavior suggest he was "surprised" to see the bullet penetrate the door. After shooting through the door, he fired off another round, this time into the air. In short, the prosecution was not required to demonstrate appellant's expertise with firearms to meet its burden of proof.

In his reply brief, appellant contends that allowing the jury to determine whether injury was likely to result from his actions was akin to permitting a conviction based on recklessness or negligence. Again, we disagree. The necessary criminal intent was established by the actions deliberately undertaken by appellant when he applied physical force directed at Acosta—retrieving the gun, aiming it and firing it at the door, knowing Acosta had just gone through it. The crime of assault requires that a defendant commit an act the " 'natural and probable consequence[]' " of which would be a battery. (*People v. Williams, supra,* 26 Cal.4th at p. 787, italics omitted.) It does not require proof that a battery has resulted or will inevitably result. (See *People v. Chance* (2008) 44 Cal.4th 1164, 1167–1168 [81 Cal.Rptr.3d 723, 189 P.3d 971] [" 'present ability' " element of assault is satisfied "when 'a defendant has attained the means and location to strike immediately' . . . an assault may be committed even if the defendant is several steps away from actually inflicting injury, or if the victim is in a protected position so that injury would not be 'immediate,' in the strictest sense of that term"]; *People v. Aguilar* (1997) 16 Cal.4th 1023, 1028 [68 Cal.Rptr.2d 655, 945 P.2d 1204] ["One may commit an assault without making actual physical contact with the person of the victim . . . ."].) It may be established even where the victim took effective steps to avoid or prevent

injury. (*People v. Valdez* (1985) 175 Cal.App.3d 103, 112–113 [220 Cal.Rptr. 538] [assault conviction upheld where defendant fired at person protected by bulletproof glass].) As the Supreme Court explained in *Williams*, "mere recklessness or criminal negligence is . . . not enough [to support an assault conviction]," but " 'recklessness' " in this sense referred to "criminal negligence" rather than "appreciation of the risk of harm." (*People v. Williams*, at p. 788 & fn. 4.) Thus, even if appellant subjectively failed to appreciate the risk of harm likely to occur from his conduct, his actions supported the intent element of the crime. In short, on the evidence before it, the jury was entitled to conclude that appellant, who retrieved a loaded semiautomatic weapon and shot it at the door through which Acosta had just passed, had all the facts necessary to lead a reasonable person to understand that a battery would "directly, naturally and probably" result from his conduct. (*Id.* at p. 788.)

### B. Constitutionality of Section 136.1, Subdivision (b)(1)

Section 136.1, subdivision (b)(1) targets prearrest efforts to prevent a crime from being reported to the authorities. (*People v. Fernandez* (2003) 106 Cal.App.4th 943, 950 [131 Cal.Rptr.2d 358].) It provides in relevant part: "(b) Except as provided in subdivision (c) [targeting more serious efforts to prevent or dissuade], every person who attempts to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from doing any of the following is guilty of a public offense and shall be punished by imprisonment in a county jail for not more than one year or in the state prison: [¶] (1) Making any report of that victimization to any peace officer or state or local law enforcement officer or probation or parole or correctional officer or prosecuting agency or to any judge." (§ 136.1, subd. (b)(1).) To prove a violation of section 136.1, subdivision (b)(1), the prosecution must show "(1) the defendant has attempted to prevent or dissuade a person (2) who is a victim or witness to a crime (3) from making [a] report . . . to any peace officer or other designated officials." (*People v. Upsher* (2007) 155 Cal.App.4th 1311, 1320 [66 Cal.Rptr.3d 481].) The prosecution must also establish that "the defendant's acts or statements [were] intended to affect or influence a potential witness's or victim's testimony or acts." (*People v. McDaniel* (1994) 22 Cal.App.4th 278, 284 [27 Cal.Rptr.2d 306].) In other words, "section 136.1 is a specific intent crime." (*Ibid.*)

Appellant contends that section 136.1, subdivision (b)(1) violates the state and federal constitutions by impermissibly inhibiting free speech. He also suggests the statute is "fatally uncertain" or vague.[9] For the reasons discussed below, we disagree.

---

[9] Appellant failed to raise a constitutional challenge to this provision below. All issues, even those involving an alleged constitutional violation, are subject to the rule of forfeiture, and a defendant's failure to raise the issue before the trial court will generally result in the appellate court's refusal to consider it. (*People v. Yarbrough* (2008) 169 Cal.App.4th 303, 310 [86

■ "The First Amendment, applicable to the States through the Fourteenth Amendment, provides that 'Congress shall make no law . . . abridging the freedom of speech.' " (*Virginia v. Black* (2003) 538 U.S. 343, 358 [155 L.Ed.2d 535, 123 S.Ct. 1536]; see *People v. Lowery* (2011) 52 Cal.4th 419, 423 [128 Cal.Rptr.3d 648, 257 P.3d 72].)[10] "The protections afforded by the First Amendment, however, are not absolute," and the United States Supreme Court has "long recognized that the government may regulate certain categories of expression consistent with the Constitution." (*Virginia v. Black, supra*, at p. 358.) "Throughout its history [the] Court has consistently recognized at least two ways in which constitutionally protected freedom of speech is narrower than an unlimited license to talk. On the one hand, certain forms of speech, or speech in certain contexts, has been considered outside the scope of constitutional protection. [Citations.] On the other hand, general regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exercise, have not been regarded as the type of law the First or Fourteenth Amendment forbade Congress or the States to pass, when they have been found justified by subordinating valid governmental interests, a prerequisite to constitutionality which has necessarily involved a weighing of the governmental interest involved." (*Konigsberg v. State Bar* (1961) 366 U.S. 36, 49–51 [6 L.Ed.2d 105, 81 S.Ct. 997], fns. omitted.)

■ A defendant's constitutional challenge to a penal statute may be based on the contention that the law is unconstitutional as applied to him, or he may seek to have it found facially invalid. (See *People v. Rodriguez* (1998) 66 Cal.App.4th 157, 167 [77 Cal.Rptr.2d 676] [if statute found unconstitutional

---

Cal.Rptr.3d 674]; *People v. Marchand* (2002) 98 Cal.App.4th 1056, 1060 [120 Cal.Rptr.2d 687].) " ' "The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]" [Citations.]' " (*People v. Yarbrough, supra*, at p. 310, quoting *In re Sheena K.* (2007) 40 Cal.4th 875, 880–881 [55 Cal.Rptr.3d 716, 153 P.3d 282].) Here, the charge in count seven was based on two separate events—appellant's taking the cordless phone from Acosta and removing the battery, and his later call to Acosta—and the jury was instructed it could find appellant guilty if it found either to have occurred. The prosecutor stated in closing argument: "[T]here are two ways in which [appellant] committed witness intimidation. The first is when he grabbed the phone from [Acosta] as she was on the phone with [the sheriff's department], and the second is when she's on the phone with 911, after he's already left, . . . and he tells her to call the officers and tell them that everything's okay." The former event involved physical actions, not words. Had the prosecutor been aware of a potential First Amendment objection, she could have altered her strategy and urged the jury to convict based on appellant's conduct alone and almost certainly would have obtained the same result. Notwithstanding this rule of forfeiture, courts generally consider constitutional challenges to penal statutes for the first time on appeal where, as here, the arguments are legal, based on undisputed evidence, and center on review of abstract and generalized legal concepts. (See, e.g., *People v. Yarbrough, supra*, at p. 310; *People v. Delacy* (2011) 192 Cal.App.4th 1481, 1493 [122 Cal.Rptr.3d 216].)

[10] The California Constitution similarly protects "[e]very person['s]" right to "freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right." (Cal. Const., art. I, § 2, subd. (a).)

" ' "as applied," ' " future application in a similar context is precluded, whereas successful facial challenge renders it " 'utterly inoperative' "].)

To the extent appellant's conduct in the instant matter is at issue, there is no question that California has a strong governmental interest in supporting and protecting citizens who wish to report violations of its criminal laws.[11] "This fundamental principle is embodied in Penal Code section 136.1, which declares that it is a misdemeanor to dissuade or attempt to dissuade any victim of crime from reporting the crime to the police." (*Barela v. Superior Court* (1981) 30 Cal.3d 244, 252 [178 Cal.Rptr. 618, 636 P.2d 582].) " 'It is for the best interests of society that those who offend against the laws shall be promptly punished, and that any citizen who has good reason to believe that the law has been violated shall have the right to cause the arrest of the offender.' " (*Ibid.*, quoting *Ball v. Rawles* (1892) 93 Cal. 222, 228 [28 P. 937].) Section 136.1, subdivision (b) protects and supports persons seeking to report crimes, and appellant's conduct was clearly within the category of behavior legitimately proscribed by the statute. The evidence established that he grabbed the phone from Acosta's hand while she was talking to the sheriff's department, hung it up, removed the batteries, and separated the phone from the batteries. After firing a bullet through the laundry room door in the direction where he had last seen Acosta, he called her on her cell and told her to tell the police that "everything is fine." On these facts, there can be no doubt that appellant's intent was to do precisely what the law legitimately prohibits: prevent and dissuade Acosta from reporting appellant's crimes to the police.

We turn now to appellant's claim that the statute is facially overbroad.[12] The United States Supreme Court has warned that in considering a facial challenge to a statute, "it is necessary to proceed with caution and restraint," as invalidation may result in improper interference with a state's

---

[11] Appellant's opening brief contains no analysis of whether his conduct and speech were worthy of First Amendment protection. In a footnote in his reply brief, appellant maintains he "does not have to demonstrate that his conduct was protected speech or conduct," before launching into a brief attempt to persuade us that his speech was protected and his conduct "expressive." Though not required to do so, we address his contention.

[12] With respect to appellant's standing to raise an overbreadth challenge, the Supreme Court explained in *City Council v. Taxpayers for Vincent* (1984) 466 U.S. 789, 798–799 [80 L.Ed.2d 772, 104 S.Ct. 2118], that although a litigant generally has standing only to vindicate his own constitutional rights, "the very existence of some broadly written statutes may have such a deterrent effect on free expression that they should be subject to challenge even by a party whose own conduct may be unprotected. . . . . [S]uch a statute may be challenged on its face even though a more narrowly drawn statute would be valid as applied to the party in the case before [the court]." (Fn. omitted.) However, a party who fails to demonstrate that the statute is unconstitutional as applied to the party or to persuade the court of the merits of a facial challenge, "has no 'standing' to allege that, as applied to others, the statute might be unconstitutional." (*Secretary of State of MD. v. J. H. Munson Co.* (1984) 467 U.S. 947, 959 [81 L.Ed.2d 786, 104 S.Ct. 2839].)

legitimate power to regulate conduct. (*Erznoznik v. City of Jacksonville* (1975) 422 U.S. 205, 216 [45 L.Ed.2d 125, 95 S.Ct. 2268].) "[I]nvalidating a law that in some of its applications is perfectly constitutional—particularly a law directed at conduct so antisocial that it has been made criminal—has obvious harmful effects." (*United States v. Williams* (2008) 553 U.S. 285, 292 [170 L.Ed.2d 650, 128 S.Ct. 1830].) Accordingly, to support a facial challenge on overbreadth grounds, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court . . . ." (*City Council v. Taxpayers for Vincent, supra,* 466 U.S. at p. 801.) "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." (*Id.* at p. 800; accord, *People v. Toledo* (2001) 26 Cal.4th 221, 234–235 [109 Cal.Rptr.2d 315, 26 P.3d 1051] ["A statute may not be found constitutionally invalid on overbreadth grounds simply because it is possible to conceive of one or a few impermissible applications; such invalidity occurs only if the provision inhibits a substantial amount of protected speech. [Citation.]"].) "The overbreadth claimant bears the burden of demonstrating, 'from the text of [the law] and from actual fact,' that substantial overbreadth exists." (*Virginia v. Hicks* (2003) 539 U.S. 113, 122 [156 L.Ed.2d 148, 123 S.Ct. 2191].)

 "The concept of 'substantial overbreadth' is not readily reduced to an exact definition." (*City Council v. Taxpayers for Vincent, supra,* 466 U.S. at p. 800.) "Where the statute in question is narrowly drawn to protect a legitimate state interest, and proscribes conduct and not purely speech," the overbreadth of the statute must be " 'judged in relation to the statute's plainly legitimate sweep.' " (*People v. Hernandez* (1991) 231 Cal.App.3d 1376, 1381 [283 Cal.Rptr. 81], quoting *Broadrick v. Oklahoma* (1973) 413 U.S. 601, 615 [37 L.Ed.2d 830, 93 S.Ct. 2908].) Thus, "[t]he first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." (*U.S. v. Williams, supra,* 553 U.S. at p. 293.) Section 136.1, subdivision (b) does not single out or target speech, but proscribes any conduct geared toward impeding a person from reporting a crime. Hiding or disabling the phone, as appellant did here, or otherwise blocking the victim's or witness's access to a means of communication are validly criminalized by the statute and have no relation whatsoever to speech. Verbal dissuasion may also support a conviction, but only a specific type of dissuasion, viz., words spoken with the specific intent of preventing or impeding that person from contacting authorities to report a crime. Accordingly, the statute's "plainly legitimate sweep" is extensive. (*People v. Hernandez, supra,* 231 Cal.App.3d at p. 1381.)

 Another consideration relevant to determining facial overbreadth is whether the statute at issue, although seeming to cast too wide a net, is or has

been subject to a narrowing construction by the courts. (*Erznoznik v. City of Jacksonville, supra*, 422 U.S. at p. 216; see *In re Andre P.* (1991) 226 Cal.App.3d 1164, 1174 [277 Cal.Rptr. 363], quoting *San Francisco Unified School Dist. v. Johnson* (1971) 3 Cal.3d 937, 948 [92 Cal.Rptr. 309, 479 P.2d 669] ["[A] statute may be interpreted narrowly to avoid overbreadth. If ' "the terms of a statute are by fair and reasonable interpretation capable of a meaning consistent with the requirements of the Constitution, the statute will be given that meaning, rather than another in conflict with the Constitution." ' "].) As stated above, section 136.1, subdivision (b)(1), has been limited in its application to persons who intentionally "prevent[] or dissuade[]" a victim or witness from reporting a crime. (See *People v. McDaniel, supra*, 22 Cal.App.4th at p. 284 ["Unless the defendant's acts or statements are intended to affect or influence a potential witness's or victim's testimony or acts, no crime has been committed under this section."].) This focus on the mental state of the perpetrator and his or her intent to affect or influence a potential witness's or victim's report limits the statute's reach by distinguishing culpable conduct from innocent conversation and restrains use of its provisions to inhibit protected speech.

Courts in other states have similarly construed comparable statutes. In *New Jersey v. Crescenzi* (App.Div. 1988) 224 N.J. Super. 142 [539 A.2d 1250], the court rejected a First Amendment overbreadth argument to a statute that prohibited " 'knowingly attempt[ing] to induce or otherwise cause a witness or informant to . . . [w]ithhold any testimony, information, document or thing.' " (539 A.2d at p. 1252, quoting N.J. Stat. Ann. § 2C:28-5(a).) The jury was expressly charged that before the defendant could be found guilty, the prosecution was required to prove he " 'knowingly attempted to induce or otherwise cause a witness or informant to withhold any testimony, information[,] document or thing from the investigating body,' and also that the purpose of his comments . . . at the time was to influence behavior of a witness or the withholding of information by an informant." (539 A.2d at p. 1252, italics omitted.) The court found the statute was not overbroad: "[T]he statute furthers the important governmental interest of preventing intimidation of, and interference with, potential witnesses or informers in criminal matters and easily meets the test of weighing the importance of this exercise of speech against the gravity and probability of harm therefrom. [Citation.] When the public interest in discovering the truth in official proceedings is balanced against a party's right to speak to a particular witness with the intent of tampering, that party's right is 'miniscule.' " (*New Jersey v. Crescenzi, supra*, 539 A.2d at pp. 1252, 1253, italics omitted; see *Connecticut v. Cavallo* (1986) 200 Conn. 664, 668–669 [513 A.2d 646, 649] [because statute prohibiting tampering with a witness—defined to include " 'induc[ing] or attempt[ing] to induce' " a witness to " 'withhold testimony' "—contained implicit requirement that "perpetrator intend to cause the

witness to alter or withhold his testimony," statute survived constitutional challenge; statute's focus on the mental state of the perpetrator "distinguish[ed] culpable conduct from innocent conduct"]; *Connecticut v. Bennett-Gibson* (2004) 84 Conn.App. 48, 59 [851 A.2d 1214, 1224], quoting Conn. Gen. Stat. § 53a-151(a) ["[M]embers of the public have no basis for concern that they might be subject to prosecution when their statements unintentionally cause a witness to 'testify falsely, withhold testimony, elude legal process summoning him to testify or absent himself from any official proceeding.' "].)

Appellant attempts to meet his burden of establishing that substantial overbreadth exists by devising a number of hypotheticals. He contends that the law would preclude an attorney from "advising a client to file a civil lawsuit for damages in response to a crime"; prohibit a store manager from "direct[ing] employees to call the parents of first-time shoplifters under the age of 18 instead of reporting such incidents to the police"; and prevent citizens from "express[ing] their opinion about which crimes warrant government intervention, and which do not," "attempt[ing] to prevent a friend from reporting a small theft to the police by expressing the opinion that it will be more trouble and paperwork than it's worth," or "suggesting that the problem [of criminal activity] be handled privately with an apology, with amends being made, or some other way." A party does not establish facial unconstitutionality by "summon[ing] forth an endless stream of fanciful hypotheticals." (*United States v. Williams, supra,* 553 U.S. at p. 301.) In *U.S. v. Chappell* (4th Cir. 2012) 691 F.3d 388, 393, the court rejected the defendant's argument that a statute prohibiting the impersonation of officers was overbroad simply because it could conceivably be applied to "costumed party-goers, children, and actors": "We decline to facially invalidate [the statute] just because [the defendant] can conceive of far-fetched applications involving innocent behavior." (*Ibid.*) There is no reason to believe persons engaged in conduct of the type appellant posits are in substantial danger of prosecution under the statute. The statute prohibits statements specifically intended to induce a witness or victim to withhold evidence of a crime from law enforcement officials. Ordinary citizens discussing the criminal justice system and the pros and cons of becoming involved in a police investigation would not run afoul of the law.[13]

---

[13] Appellant also argues that the alleged overbreadth of section 136.1, subdivision (b)(1) cannot be cured with a limiting instruction. We find no constitutional infirmity. Even had we concluded the statute could conceivably be applied to situations as described by appellant, there is no possibility that occurred here. The jury was instructed that in order to find appellant guilty, it must conclude he acted with the specific intent to annoy, harm or injure the victim or to thwart or interfere with the orderly administration of justice. There is thus no risk appellant was convicted of constitutionally protected conduct.

 Appellant alternatively suggests that the provision is "fatally uncertain" and unconstitutionally vague. "Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to ' "steer far wider of the unlawful zone" . . . than if the boundaries of the forbidden areas were clearly marked.' " (*Grayned v. City of Rockford* (1972) 408 U.S. 104, 108–109 [33 L.Ed.2d 222, 92 S.Ct. 2294], fns. omitted.) "Vagueness doctrine is an outgrowth . . . of the Due Process Clause of the Fifth Amendment. A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." (*United States v. Williams, supra*, 553 U.S. at p. 304.) "Although ordinarily '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others,' " the Supreme Court has "relaxed that requirement in the First Amendment context, permitting [parties] to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." (*Ibid.*)

 Although appellant cites a number of authorities for the general proposition that vague penal statutes are unconstitutional, he fails to specify in what way section 136.1, subdivision (b) is vague or uncertain. The words used in the statute are clear and give notice to members of the public that attempting to prevent or dissuade a person from contacting authorities to report a crime is itself a crime. On its face, section 136.1 appears geared toward situations similar to the present one, where a defendant abuses a spouse or other cohabitant and thereafter obstructs or otherwise attempts to prevent the victim from seeking help from authorities. We see no basis for a finding that the statute is "fatally uncertain" or unconstitutionally vague.[14]

---

[14] As noted in respondent's brief, a number of courts in other jurisdictions have rejected contentions that similar statutes were unconstitutionally vague. (See, e.g., *New Jersey v. Crescenzi, supra*, 539 A.2d at p. 1253; *Connecticut v. Cavallo, supra*, 513 A.2d at pp. 650–651; *Connecticut v. Bennett-Gibson, supra*, 851 A.2d at pp. 1222–1223; *People v. Esteves* (N.Y.Crim.Ct. 1976) 85 Misc.2d 217, 219–220 [378 N.Y.S.2d 920].)

C.–F.*

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

## DISPOSITION

The judgment is modified to reflect 662 days of presentence custody credit, consisting of 576 days of actual credit and 86 days of good time/work time credit. In all other respects the judgment is affirmed. The superior court is directed to prepare an amended abstract of judgment to reflect this modification and to forward a copy to the Department of Corrections and Rehabilitation.

Willhite, Acting P. J., and Suzukawa, J., concurred.

A petition for a rehearing was denied February 13, 2013, and appellant's petition for review by the Supreme Court was denied May 1, 2013, S209036.

---

*See footnote, *ante*, page 1336.