Filed 6/18/24  P. v. Ortiz CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SERGIO ORTIZ,<br><br>    Defendant and Appellant. | 2d Crim. No. B327985<br>(Super. Ct. No.<br>F000270432003)<br>(San Luis Obispo County) |

In 1998 a jury convicted appellant Sergio Ortiz of second degree murder.  (Pen. Code, §§ 187, subd. (a), 189.)[1]  We affirmed the judgment in an unpublished opinion.  (*People v. Garcia et al.* (July 23, 2001, B126854) (*Garcia*).)  In 2019 appellant filed a petition to vacate his murder conviction and obtain resentencing pursuant to section 1172.6.  Appellant claims his murder conviction should be reduced to assault.

In a 2022 unpublished opinion, we reversed the trial court's order denying appellant's petition at the prima facie stage.  We

---

[1] All statutory references are to the Penal Code.

remanded the matter to the trial court with directions to issue an order to show cause and conduct an evidentiary hearing as required by section 1172.6, subdivision (d). (*People v. Ortiz* (March 3, 2022, B300776) (*Ortiz I*).)

Appellant appeals the denial of his section 1172.6 petition at the evidentiary hearing. The trial court found him guilty of second degree murder based on the theory that he had directly aided and abetted implied malice murder. Appellant contends: (1) substantial evidence does not support the trial court's findings, (2) "the trial court misunderstood the elements of direct aiding and abetting implied malice murder" (bold and capitalization omitted), and (3) the trial court erroneously failed to consider the impact of appellant's youth on whether he had formed the requisite mens rea.

We affirm. Appellant's first and second contentions are based on a misunderstanding of the life-endangering act that he had aided and abetted. Appellant claims the life-endangering act was the actual killer's stabbing of the victim. In fact, the life-endangering act was a six-against-one brutal gang beating of a defenseless victim. Substantial evidence supports this theory of implied malice murder.

### Statement of Facts

Our summary of the facts is taken verbatim from the statement of facts at pages 2-5 of our unpublished 2022 *Ortiz I* opinion. The statement of facts in *Ortiz I* is taken from the statement of facts in our 2001 *Garcia* opinion.

We recognize that section 1172.6 provides that, at an evidentiary hearing, "[t]he court may . . . consider the *procedural history* of the case recited in any prior appellate opinion." (*Id.*, subd. (d)(3), italics added.) It does not provide that the court may

2

consider the underlying facts recited in a prior appellate opinion. But after the trial court stated that it had "read and considered" the reporter's transcript of the original jury trial, without objection the court said, "[B]ecause the Second District Court of Appeal[']s statement of facts and opinions contained a summary of the most important details for purposes of this analysis, I'm going to be relying on that succinct summary in rendering my decision." We therefore set forth the relevant facts as summarized in *Ortiz I.* (See *People v. Vance* (2023) 94 Cal.App.5th 706, 714 ["We conclude that, when an appellate opinion is admitted at an evidentiary hearing under section 1172.6, without objection, it is substantial evidence that the trial court can consider"].)

"Paso Robles 13 (Paso 13) is a criminal street gang. [Raul] Mosqueda, whose moniker is 'dreamer,' was a past associate of Paso 13. Mosqueda was friendly with the members of Nameless Crew Style (NCS), a rival gang that was engaged in 'warfare' with Paso 13. . . . Paso 13 put out a 'green light' on Mosqueda, which meant that he was 'free game' to kill. [David] Rey and [Oscar] Garcia were members of Paso 13, and [appellant] associated with the gang. [¶] . . . Rey believed that Mosqueda had falsely accused him of vandalizing [appellant's] car. Rey told [appellant] that Mosqueda had committed the vandalism. Rey said he 'was going to take care' of 'dreamer.'

"[¶]

"[¶]

"During the evening of April 12, 1998, Reginald Calhoun went to the trailer park residence of [appellant] and [Monte] Weatherington. [Appellant and other persons were present]

there.  Mosqueda became the subject of conversation, and everyone was saying, 'Hey, we want to kick dreamer's ass.'

"Calhoun was paged by [Gregory] Vived[, Jr.].  Calhoun telephoned Vived, who said that Mosqueda was going to be at a party in Paso Robles. . . .

"Calhoun, [Manuel] Preciado, and [five other persons, including appellant,] drove to the Paso Robles party in three cars.  Rey was the sole passenger in a car driven by Garcia.  Rey was armed with a knife that he displayed to Garcia inside the car.  Rey put the knife in his pocket.  At the trailer park, Rey had not displayed the knife or mentioned that he possessed it.

"After parking their cars in Paso Robles, Calhoun, Preciado, and [the five other persons, including appellant,] walked to the apartment where the party was occurring.  Weatherington knocked on the front door.  A female opened the door, and Weatherington asked to speak to 'dreamer.'  Mosqueda came to the door and said, 'What do you guys want?'  Weatherington told him to come outside.  Mosqueda said, 'We don't want no problems here.'  Mosqueda closed the door, and another person locked it.

"[¶]  Calhoun picked up a potted plant and threw it through a plate-glass window.  Rey and Weatherington kicked the front door open.  Calhoun, Preciado, and [five other persons, including appellant,] ran through the doorway into the apartment.  They were saying, 'Get your beating like a man,' and 'You know what time it is.  You know it's up.'  Everyone inside 'just started scattering.'  Mosqueda retreated into a bathroom and tried to close the door.  Calhoun testified that he and Rey pulled Mosqueda out into the hallway, but other witnesses testified that Weatherington did the pulling.  Calhoun and [five other persons,

4

including appellant,] punched Mosqueda in the hallway.  There was 'a big commotion of bodies' and people were screaming.

"[¶]

"Mosqueda fell to the floor and was lying on his side against a wall.  Garcia said to Rey, 'You got a knife.  You got a knife.  Stick him.  Stick him.'  Rey stabbed Mosqueda four times in the chest.  Mosqueda crawled out of the hallway 'like a baby' on his hands and knees with blood on his face, chest, and stomach.  Rey, Vived, Garcia, [appellant], and Calhoun were 'around him' and were punching and kicking him.  People in the background were saying, 'Leave him alone.  He's knocked out.[']  Mosqueda fell to his side.  Rey, Vived, Garcia, [appellant], and Calhoun continued to hit and kick him.  Garcia said, 'Now what's up dreamer? . . .  Now you ain't talking.  You're not saying nothing now, are you?'  Vived stopped 'swinging and kicking' and 'jumped up against the wall.'  He said, 'Oh shit . . . What happened?  What happened?'  Vived appeared to be 'in shock.'  Everybody except [appellant] ceased attacking Mosqueda.  [Appellant] kicked him twice in the head. . . .

"Later that night, Preciado, appellant, and Weatherington met Garcia in a parking lot.  Garcia told them that Rey had stabbed Mosqueda 'penitentiary style, real quick,' and that anyone who said 'anything to the cops' would 'get bumped off' in prison.  Garcia said that Rey 'had got his stripes.'  This meant that Rey had earned respect from other gang members and 'was up at the top with the big boys . . . .'

"When Garcia left, Preciado, appellant, and Weatherington went to a motel.  According to Preciado, at the motel they discussed the stabbing, agreeing that Rey 'was wrong for doing it . . . without saying anything . . . .'  But earlier in the evening

5

[appellant] had declared, 'We got their guy. It's going to be a good night.'

"An expert on criminal street gangs testified that the killing of Mosqueda had benefited Paso 13 because it had 'slowed down' the escalation in violence between Paso 13 and NCS and had 'put [Paso 13] back on top.'"

*Section 1172.6*

Section 1172.6, subdivision (a) provides that "[a] person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime . . . may file a petition with the court that sentenced the petitioner to have the petitioner's murder . . . conviction vacated and to be resentenced on any remaining [charges] when" certain conditions apply.

After a section 1172.6 petition is filed, "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief. If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause." (*Id.*, subd. (c).)

If an order to show cause is issued, the court shall conduct an evidentiary hearing to determine the petitioner's eligibility for relief. (§ 1172.6, subd. (d)(1).) At the evidentiary hearing the burden is on the People "to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . ." (*Id.*, subd. (d)(3).)

*Trial Court's Ruling*

In determining that appellant was guilty of second degree murder as a direct aider and abettor of implied malice murder, the trial court reasoned as follows:

"[Appellant] deliberately [] participated in a brutal gang beating of a defenseless victim knowing that he had been green lighted by the gang, and the actual consequences of his conduct were dangerous to human life, and [appellant] knew that his conduct endangered Mr. Mosqueda's life and acted with conscious disregard for life.

" [¶]

" . . . [Appellant] forcibly invaded a home with the express intent to, quote, 'Kick Dreamers ass.' . . . Reginald Calhoun, during his testimony at trial, when asked what could happen when seven men invade a house to kick someone's ass, testified that, 'He can get hurt.  Broken bones.  He could die.' . . .

"[Appellant] specifically intended that he and his accomplices assault Mosqueda by means of force likely to produce great bodily injury.  The assault was committed on a person who had been green lighted by a criminal street gang.  The green light meant that Mr. Mosqueda was free game to kill and increased the risk the assault would result in his death.  [Appellant] associated [with] Paso Robles 13, and the jury found he committed the murder for the benefit of the gang. . . .

" [¶]

" . . . [Appellant] knew the actual killer, David Rey, harbored a personal grudge against Mr. Mosqueda.  Rey had said he was going to take care of Dreamer.  [Appellant] and five other individuals, including two gang members, vi[]ciously assaulted Mr. Mosqueda, who was unarmed and on his own.  After Mr. Rey mortally wounded him, [appellant] and four others continued to hit and kick him while he was on his hands and knees with blood on his face, chest and stomach.  And after the other assailants

7

had ceased their attack [appellant] kicked Mosqueda twice in the head.

"After the killing, [appellant] declared, 'We got their guy. It's going to be a good night.' By using the word 'we,' [appellant] took credit for Mr. Mosqueda's murder. 'It's going to be a good night' shows he not only approved of the murder, but also intended to celebrate it.

"Based on the totality of the evidence, . . . I do find [that] the People have met their burden beyond a reasonable doubt that [appellant] . . . is guilty [of] murder."

*Direct Aiding and Abetting of Implied Malice Murder*

"[A] defendant may directly aid and abet an implied malice murder." (*People v. Reyes* (2023) 14 Cal.5th 981, 990.) "'[D]irect aiding and abetting is based on *the combined actus reus of the participants* and the aider and abettor's own mens rea. [Citation.] In the context of implied malice, the actus reus required of the perpetrator is the commission of a life endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.'" (*Id.* at pp. 990-991, italics in first sentence added.)

8

*Substantial Evidence Supports Finding that Appellant*
*Directly Aided and Abetted Implied Malice Murder*

"To determine whether sufficient evidence supported [the trial court's] findings, we apply the substantial evidence standard of review.  [Citation.]  [¶]  The principles of substantial evidence review are well-settled.  'Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for "'substantial evidence—that is, evidence which is reasonable, credible, and of solid value'" that would support a finding beyond a reasonable doubt.'  [Citation.]  We must 'review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  [Citation.] . . . [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence.  [Citation.]  "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends."'. . ."  (*People v. Montanez* (2023) 91 Cal.App.5th 245, 270-271.)  "'"A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"'"'" the factfinder's decision."  (*Id.* at p. 271.)

Appellant contends the evidence is insufficient to show that he directly aided and abetted implied malice murder because "[t]here is no substantial evidence that [he] intended to aid Rey in the stabbing."  (Bold omitted.)  Appellant argues: "[I]t is

9

undisputed that the life-endangering act was the stabbing . . . and [] [he] did not . . . know that Rey had a knife or intended to stab Mosqueda."

The trial court's conclusion that appellant had directly aided and abetted implied malice murder was not based on speculation that he knew Rey intended to stab Mosqueda. It was based on appellant's knowledge that he and his accomplices were committing a life-endangering act – a forcible home invasion that, as the trial court said, involved "a brutal gang beating of a defenseless victim knowing that he had been green lighted by the gang." For the reasons set forth in the previous section entitled "*Trial Court's Ruling*," *ante* at pp. 6-8, substantial evidence supports the court's finding that appellant had the requisite knowledge. (See this court's opinion in *People v. Schell* (2022) 84 Cal.App.5th 437, 440, 442-443 (*Schell*) [evidence sufficient to support conviction of implied malice murder where defendant "was one of at least eight gang members or gang associates who participated in a vicious assault upon the victim," even though, like appellant, defendant's participation was limited to an "attack with his fists and feet"]; see also *People v. Montes* (1999) 74 Cal.App.4th 1050, 1056 ["Given the great potential for escalating violence during gang confrontations, it is immaterial whether Montes specifically knew Cuevas had a gun].)

Appellant argues that, as to him, the court's "gang-related findings are not supported by substantial evidence." (Bold omitted.) But a gang expert opined that appellant "associated with Paso 13." Officers from the gang task force had "observed [appellant and Garcia] together on several occasions . . . over the course of the last approximate nine months" prior to the murder. Garcia "admitted membership in Paso Robles 13."

10

Moreover, appellant was immersed in the gang lifestyle. The gang expert testified that since 1992 appellant had "appear[ed]" to claim membership in another criminal street gang – Monte Flores. "[A] photograph was obtained of him showing [the] Monte Flores handsign." Appellant testified that he had been "an associate of El Monte Flores" until 1992 or 1993, when he left the gang. But while in jail in August 1998, appellant wrote a letter to a gang member that, according to the gang expert, was "pretty indicative of the gangster lifestyle, the gangster way of thinking." For example, appellant wrote: "'A lot of people try to walk like a gangster and talk like a gangster, but a real vato' . . . 'will always spot the fakes.' [¶] 'We don't tell people we are the real deal, we let them see it."

Appellant maintains that "Paso 13 is not a criminal street gang under current law" because "there is no substantial evidence of a pattern of criminal gang activity" and the gang expert's "testimony about the predicate offense is not substantial evidence." Appellant is referring to recent amendments of section 186.22, the gang statute. The amendments are irrelevant. We are not concerned with whether in 1998, when the murder was committed, Paso 13 qualified as a criminal street gang under current law.

Appellant claims "[t]here is no evidence that [he] knew Mosqueda had been green lighted by Paso 13." (Bold omitted.) Because appellant associated with Paso 13, the trial court reasonably inferred he was aware of the "green light." The gang expert opined "that there was a contract that was put out on [Mosqueda] by Paso 13."

"Appellant's presence at the scene, his participation in the attack on the victim, his companionship with other perpetrators,

11

his conduct before and after the crimes, and his motive of retaliation for disrespect all support the finding that he aided and abetted an implied malice murder." (*Schell, supra*, 84 Cal.App.5th at p. 443.) As to "his motive of retaliation for disrespect," evidence was presented that appellant believed Mosqueda had vandalized appellant's car. Manuel Preciado testified that appellant had "said he didn't like dreamer" "[b]ecause of the car vandalism." Appellant testified that, when he kicked Mosqueda in the head, he "was upset" and "angry" because of "the vandalism to [his] car."

"'[A]ppellant did not need to specifically know that someone would strike [Mosqueda] with [a [knife]] . . . to be liable under an implied malice theory. It suffices that he knew he was aiding in a violent [six-against-one gang] attack . . . and intended to stop [Mosqueda] from escaping or defending himself by helping the perpetrators to surround and hit him.'" (*Schell, supra,* 84 Cal.App.5th at p. 443.) Because substantial evidence supports the trial court's findings, we reject appellant's contention that he was denied his constitutional right to due process.

*The Trial Court Did Not Misunderstand the Elements*
*Of Directly Aiding and Abetting Implied Malice Murder*

"'[A] trial court is presumed to have been aware of and followed the applicable law. . . .'" (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114.) Appellant contends the trial court "misunderstood the elements of direct aiding and abetting implied malice murder." (Bold omitted.) Appellant argues that the misunderstanding arose because the court was not aware that "the life endangering act was Rey's act of stabbing Mosqueda multiple times . . . . [¶] Accordingly, the trial court should have determined whether [appellant] knew that Rey intended to stab

12

Mosqueda, intended to aid him in the stabbing, knew that the stabbing was dangerous to life, and acted in conscious disregard for life."

In the previous section of this opinion, we explained that the relevant life-endangering act was not the stabbing, but instead was appellant's participation in the violent gang beating of Mosqueda. There is no suggestion that the trial court misunderstood the law.

*Trial Court's Alleged Failure to Consider Impact of Appellant's Youth on Whether He Had Formed the Requisite Mens Rea*

Appellant was 22 years old when he participated in the assault upon Mosqueda. Appellant claims the trial court erroneously failed to consider his youth in determining whether he had formed the requisite mens rea for directly aiding and abetting implied malice murder.

Appellant relies on *People v. Pittman* (2023) 96 Cal.App.5th 400 (*Pittman*). Pittman petitioned for section 1172.6 relief after he had been convicted of implied malice murder. The court held that if a defendant is 25 years old or younger, his youth "[is] a factor in the totality of the circumstances bearing on whether [he] acted with implied malice." (*Id.* at p. 417.) The appellate court reversed the denial of Pittman's petition because the trial court had not considered that he was 21 years old at the time of the offense. It remanded the matter to the trial court with directions "to consider how, if at all, Pittman's youth impacted his ability to form the requisite mental state for [implied malice] second degree murder." (*Id.* at p. 418.) Appellant argues that we should similarly reverse the denial of his petition. He asserts, "A[s] a matter of law, at age 22, [he] was a youthful offender suffering

13

from the emotional and cognitive disabilities of his developing brain."

The issue of appellant's youth was not raised in the trial court, but the evidentiary hearing was conducted on March 29, 2023, more than six months before *Pittman* was decided. Nevertheless, we agree with the People that appellant forfeited the issue by failing to raise it at the evidentiary hearing. "All issues . . . are subject to the rule of forfeiture, and a defendant's failure to raise the issue before the trial court will generally result in the appellate court's refusal to consider it." (*People v. Navarro* (2013) 212 Cal.App.4th 1336, 1347, fn. 9.)

In *Pittman* the petitioner had also not raised the issue of his youth in the trial court. The appellate court concluded that a forfeiture had not occurred because the petition was denied in 2020, and "[t]he relevant appellate cases were not decided until 2021 or later." (*Pittman, supra*, 96 Cal.App.5th at p. 416.) The court listed eight relevant cases that were decided in 2021 and 2022. (*Ibid.*; see, e.g., *In re Moore* (2021) 68 Cal.App.5th 434, 439 ["a defendant's youth at the time of the offense should be a factor in determining whether that defendant acted with reckless indifference to human life under section 190.2, subdivision (d)"]; *People v. Jones* (2022) 86 Cal.App.5th 1076, 1093 ["it is best for the trial court to have a meaningful opportunity to consider Jones's youth [Jones was 20 years old at the time of the offense] as part of the totality of the circumstances germane to determining whether he was a major participant who acted with reckless indifference to human life"].) *Pittman* is distinguishable because all of the eight relevant cases cited in *Pittman* were decided before appellant's March 29, 2023 evidentiary hearing.

Even if appellant had preserved the issue of his youth for appellate review, no prejudicial error would have occurred. "[I]t is [not] 'reasonably probable that a result more favorable to [appellant] would have been reached in the absence of the [alleged] error.'" (*People v. Oliver* (2023) 90 Cal.App.5th 466, 489, fn. 8 (*Oliver*).) Appellant was not a teenager. He was a 22-year-old adult, three months shy of his 23rd birthday. Appellant was born on July 21, 1975. The offense was committed on April 12, 1998.

"[T]he case law discussing the differences in brain development among youthful offenders (in contrast to their adult counterparts) stress two areas of divergence: (1) their relative impulsivity; and (2) their vulnerability to peer pressure. [Citation.] There is no evidence in this case that [appellant's] criminal behavior was motivated by either of these two factors." (*Oliver, supra*, 90 Cal.App.5th at p. 489.) The assault upon Mosqueda was not impulsive; it was planned in advance. "[W]e are not here presented with a situation where a youthful offender was swept up in circumstances beyond his or her control that led to an unintended death." (*Ibid*.) "As for peer pressure, there is no evidence that [appellant] felt compelled to assist in" the home invasion and assault upon Mosqueda. (*Ibid*.) He was a willing participant.

Appellant's "actions during this crime did not show 'a transient rashness' or 'inability to assess consequences.' [Citation.] Nor do we perceive any '"impetuosity"' or '"failure to appreciate risks and consequences."'" (*Oliver, supra*, 90 Cal.App.5th at p. 490.) Appellant "has failed to present on appeal or in the court below *any* specific support for the proposition that

his level of maturity somehow lessened his culpability for this murder." (*Ibid.*)

*Disposition*

The order denying appellant's section 1172.6 petition is affirmed.

<u>NOT TO BE PUBLISHED.</u>

YEGAN, J.

We concur:

GILBERT, P. J.

CODY, J.

16

Jacquelyn H. Duffy, Judge

Superior Court County of San Luis Obispo

_____

Mi Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Stephanie C. Brenan, Supervising Deputy Attorney General, Gabriel Bradley, Deputy Attorney General, for Plaintiff and Respondent.