Filed 1/10/14  P. v Boutte CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063209 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. Nos. SCD237376, SCD238761) |
| WALLACE J. BOUTTE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Richard S. Whitney, Judge.  Affirmed.

Steven J. Carroll, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Marissa Bejarano, Deputy Attorneys General, for Plaintiff and Respondent.

Wallace Boutte appeals from a judgment convicting him of corporal injury to a cohabitant, and several counts of attempting to dissuade a witness and violation of a protective order.  He asserts (1) the trial court violated his rights by denying his request to

discharge retained counsel, and (2) there is insufficient evidence to support that he had the required specific intent for two of the witness dissuasion counts. We reject these contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On the night of October 27, 2011, defendant assaulted his girlfriend Leilani Weary during an argument in their bedroom. After arguing with Weary on the phone earlier in the day, defendant came home at about 11:30 p.m. and, apparently drunk, told Weary to "wake [her] ass up." He told her that he was going to make this an all-nighter (meaning they would be up all night arguing), and if she was not willing to have sex with him she could "take [her] ass in the living room." When Weary said she would go in the living room, defendant initially agreed and he left the bedroom. However, he then returned, closed the bedroom door, and said, "[F]uck that. I'm not going nowhere. You're not going nowhere either." Weary begged defendant to let her go in the living room and tried to run out the bedroom door, but defendant kept pushing her back down on the bed. At one point she got halfway out the door, and as he was pulling her back in she was yelling out to his daughter. His daughter came out of her room and told him to leave Weary alone, but defendant said he made a mistake before and ended up in prison by letting "some bitch get away . . . before she healed up" and he was not "doing time again behind another bitch . . . ."

As Weary was again running to the bedroom door, defendant pushed her against her forehead, which "bust[ed] [her] forehead open," broke her glasses, and caused her to

2

fall back onto the bed.[1]  She had a gash on her forehead and had "blood just coming down," but defendant would not let her out of the room to clean her face and told her she was not going anywhere until she "heal[ed] up."  She grabbed something in the room to try "to hold the blood from draining from [her] forehead."  Defendant said he was going to call his parents and "everybody [and] tell them bye because he was going to kill us"; he knew places where he could throw a body where it would never be found; he was not going to go to work and their son was not going to go to school because he was going to make sure she stayed home; and he did not care if she bled to death.  Defendant told his daughter to get a towel and give it to Weary to clean her face, and his daughter got a rag and tried to clean Weary and the blood spots on the floor.

As Weary continued to cry and scream, defendant told her to "shut up" or he would "shut [her] up."  Weary told him to "do what [he] got to do."  He pushed her across the bed and started choking her.  Weary tried to scream but nothing came out; she "saw black"; and she "knew [she] was dead that day."  Defendant's daughter was screaming at him to stop, and he got off Weary.

When defendant calmed down, he told Weary he was sorry.  She started "bullshitting him" so he would let her go, saying she loved him; she knew he was on parole for a prior domestic violence case; she would tell people that she "bumped [her]

---

[1]     Weary testified she could not remember if defendant used an "open hand" or a fist when he hit her.  In any event, she testified the gash in her forehead was caused by defendant's hand, and she did not bump her head on the headboard or cabinet.

During the defense case, a physician assistant at the hospital where Weary was treated testified that Weary told him that defendant pushed her, grabbed her by the neck, and "she fell and hit her head" which caused a forehead laceration.

3

head on the cabinet or something"; he should go to work and she would be there when he got back home; and they would "get [past] this like nothing ever happened." The next day after defendant went to work and she took her son to the bus stop, she called her mother to take her to the hospital and hospital personnel summoned the police.

As a result of the assault, Weary had a laceration on her forehead; cuts on her nose incurred when her glasses broke; bruising on her chest from the pushing; and red marks on her neck from the choking. Hospital personnel treated the gash on her forehead with glue. At the time of trial she still had a scar from this injury.

After defendant was arrested, in December 2011 he made three phone calls from jail to Weary in violation of a restraining order secured by Weary after the assault. During the recorded phone conversations, defendant pleaded with Weary to stop cooperating with the district attorney's office so he would not go to prison.

*Jury Verdict*

For the assault incident, defendant was charged with inflicting corporal injury on a cohabitant, making a criminal threat, and false imprisonment by violence or menace. For the subsequent phone calls to the victim, he was charged with three counts each of attempting to dissuade a witness from assisting in a prosecution and violation of a protective order.[2]

The jury acquitted defendant of the criminal threat charge and was deadlocked on the false imprisonment charge. He was convicted of the counts alleging cohabitant

---

[2] The charges for the two incidents were consolidated on the first day of trial.

injury, witness dissuasion, and violation of a protective order. Based on his current convictions, plus a serious felony prior conviction, a prior prison term, and a strike prior conviction, he was sentenced to 16 years eight months in prison.

## DISCUSSION

### I. *Denial of Request To Discharge Retained Counsel*

Defendant was initially represented by a public defender, and after an unsuccessful request to obtain a different public defender, he hired private counsel. On the day the trial was set to start, defendant requested to discharge his retained counsel. Defendant argues the court violated his rights to counsel of his choice and due process when it denied his request to discharge his retained counsel.

#### A. *Background*

##### 1. *Defendant's Request To Discharge Appointed Counsel*

The charges against defendant were brought in November 2011 (the domestic violence case) and January 2012 (the witness dissuasion case). During the initial pretrial proceedings, defendant was represented by the public defender. In February 2012, defendant made a *Marsden*[3] motion to relieve his appointed counsel. Defendant complained that his counsel had met with him only one time for about one hour; otherwise he only saw his counsel for about 30 minutes before court appearances; and his counsel had not asked for his "side of the story" or discussed a strategy to "beat this case." Defendant stated he did not think his counsel was helping him; did not trust him

---

3       *People v. Marsden* (1970) 2 Cal.3d 118.

or have confidence to go to trial with him; and felt his counsel was "working with the DA." Defense counsel responded he had met with defendant numerous times; they had good communication; defendant had clearly communicated his defense and provided a substantial amount of information to attack the victim's credibility; the case had been thoroughly investigated; and he was able to work with defendant and was fully prepared to go to trial.

Defense counsel told the court that defendant might be upset because he was dissatisfied with the plea bargain offer from the prosecutor. Defendant responded that it appeared the prosecutor was "running everything, the whole show" and his counsel would just say "the DA is not going to go for this." Defense counsel explained that he advised defendant to consider settling the case because it was very difficult to win and he could potentially receive a 22-year eight-month sentence; however, he assured defendant he would do his best to convince a jury that there was a reasonable doubt of guilt.

The court denied the *Marsden* motion, finding there was no breakdown in communication; defense counsel was representing defendant's interests and had prepared the case for trial; and there was no evidence defense counsel was colluding with the prosecutor. The court explained to defendant that his counsel had no ability to change or control the prosecutor's plea bargain offers, and encouraged defendant to cooperate with his counsel.

2. *Defendant's Representation by Retained Counsel*

After the *Marsden* hearing on February 16, 2012, both cases were set for trial on April 23, 2012. Ten days before the trial date, defendant retained Attorney Pamela

6

Lacher to represent him in lieu of the public defender. The trial was rescheduled to June 5, 2012, and later continued to August 6, 2012. On August 2, 2012, the trial was reset to start on September 18, 2012. The September 18 trial date was confirmed during three ensuing pretrial hearings (an August 15 hearing on a motion to dismiss the witness dissuasion charges; a September 10 readiness conference; and another pretrial hearing on September 13).

### 3. *Defendant's Request To Discharge Retained Counsel*

On September 18, 2012, the parties appeared for the scheduled commencement of trial. At the start of the proceedings, defendant requested to discharge retained counsel Lacher, and the matter was discussed at a lengthy hearing. The court recognized that a request to discharge retained counsel was not governed by the same standards as a request for new appointed counsel, and that a denial had to be based on findings of delay or prejudice to defendant's interests.[4] The court noted the jury was "in the hallway"; appointment of new counsel would delay the case another 30 to 90 days; defendant had six months since the April 2012 trial date to request a change in counsel; and defendant could have made the request "well in advance of right now." The court inquired why defendant wanted new counsel and why he waited until the time of trial to make the request.

---

[4] The court initially referred to the hearing as a *Marsden* hearing, but after defense counsel pointed out that the standard was different for retained (as opposed to appointed) attorneys, the court clarified that it understood this distinction.

7

Defendant explained that he felt his retained counsel had not accomplished anything because he was being offered the same deal that his public defender had secured for him, and another attorney had advised him to ask for a different public defender and if he was told "the same thing" by new counsel, then he should "take the deal." Defendant also stated his retained attorney did not communicate with him and explain things to him about the case; his attorney met with him only twice and otherwise he saw her only a few minutes before court appearances; and his attorney never said they "could possibly beat this" which was the type of attorney he was trying to get. Further, based on his observations of his attorney at the recent motion hearing he did not feel she could "out argue" the prosecutor, and during a recent meeting his attorney had made him feel confident about the case but then told his wife that she should "talk some sense into him" to take the deal.

In response, Lacher said she did not want to be removed from the case, and she did not think there was a problem unless there was something she did not do that defendant wanted done. Lacher explained that defendant could communicate with her by phone at any time; she did everything on the list he had provided to her; she gave defendant's wife the same information that she gave defendant about his sentencing exposure; defendant's wife stated she wanted defendant to take the deal; and Lacher merely told his wife to talk to him. Lacher also noted that there did not appear to be a problem until the last readiness conference when they were talking about a deal.

The trial court concluded that defendant had not indicated there was anything deficient in his counsel's performance. Rather, he merely wanted a "third opinion" about

8

taking a plea bargain deal; he had already received advice on this from his two attorneys (the public defender and retained counsel); and there were no assurances that defendant would not request to relieve a third attorney for the same reasons. The court assessed that defendant had "cold feet" because "a jury [was] coming up." The court stated defendant's desire for a third opinion about the plea bargain offer did not justify a change in attorneys under circumstances where it would delay the trial and interfere with the administration of justice.

Defendant objected, stating he should not have to go to trial with an attorney who he did not want representing him, and he did not need a fourth attorney but only needed 30 days to find out from another attorney if he could get a better deal.

Unpersuaded, the court denied defendant's request to discharge his retained counsel. The court reiterated that defendant had not articulated any reasons justifying the change other than that the plea bargain offer was not good enough; he already had two attorneys advise him on the deal; and a change in attorneys would cause a significant delay because a jury was in the hall and a delay would interfere with the process of justice.

## B. *Analysis*

To obtain replacement of *appointed* counsel, a defendant must show that his counsel is providing inadequate representation or there is an irreconcilable conflict likely to result in ineffective representation. (*People v. Lara* (2001) 86 Cal.App.4th 139, 150.) In contrast, a defendant has the right to discharge *retained* counsel without a showing of cause. (*People v. Ortiz* (1990) 51 Cal.3d 975, 983.) However, the right to discharge

retained counsel is not absolute as the trial court has discretion to "deny such a motion if discharge will result in 'significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice' [citations]." (*Ibid*.) The court "should 'balance the defendant's interest in new counsel against the disruption, if any, flowing from the substitution.' " (*People v. Keshishian* (2008) 162 Cal.App.4th 425, 429.)

When exercising its discretion on a request to discharge retained counsel, the court should consider the state's interest in orderly and expeditious prosecutions, but should refrain from a " 'myopic insistence upon expeditiousness in the face of a justifiable request for delay . . . .' " (*People v. Ortiz, supra*, 51 Cal.3d at p. 984.) Thus, when considering an eve-of-trial request to discharge retained counsel, the court should evaluate whether the defendant has a persuasive reason to warrant the delay in the trial. (See *People v. Lara, supra*, 86 Cal.App.4th at pp. 162-163 [discharge of retained counsel on first day of trial may be justified by showing that counsel failed to consult with defendant and failed to interview witnesses]; compare *People v. Keshishian, supra*, 162 Cal.App.4th at p. 429 [court may properly deny last-minute motion for continuance to secure new attorney to replace experienced and fully prepared retained counsel]; *People v. Turner* (1992) 7 Cal.App.4th 913, 919.)

Here, the trial court reasonably exercised its discretion to deny defendant's request to discharge his retained counsel. The record shows the request was untimely; hence, the trial court was not required to automatically grant the substitution request. When defendant made the request, retained counsel had been representing him for five months;

10

the trial was set to start that day; prospective jurors were waiting at the courthouse; and appointment of new counsel would have resulted in a substantial delay in jury selection and the commencement of trial.

Given the untimeliness of the request, the court's task was to balance the interference with the efficient administration of justice with defendant's reasons for wanting a different attorney. The court rejected defendant's claim that his counsel was not performing adequately; assessed that defendant wanted a new attorney because he was dissatisfied with the plea bargain offer; and concluded the latter reason was insufficient to warrant a disruption in the proceedings. The record supports these findings.

Defendant's reasons for requesting replacement of his public defender were essentially the same as his reasons for requesting to discharge his retained counsel: i.e., he complained about inadequate communication and/or preparation and his lack of confidence in them, and focused on his dissatisfaction with the plea bargain offers. Both the public defender and retained counsel indicated that they perceived no problems with their representation and relationship with defendant, except for his dissatisfaction with the plea bargain offers. The trial court reasonably found that defendant's wish to have a new attorney represent him for purposes of plea bargain negotiations did not warrant a change of counsel on the day trial was set to start.

Defendant argues the trial court made no finding that his request to discharge his retained counsel was untimely, but instead improperly required him to demonstrate cause for the discharge. The record belies this claim. The court's repeated expressions of

11

concern about the waiting jurors and the delay that would result from a change in counsel clearly reflected a finding of untimeliness. The court explicitly stated that it understood that the standard for discharge of retained counsel was different than for replacement of appointed counsel, which supports that the court was *not* imposing a good cause showing as a stand-alone requirement, but rather was examining if there was good cause to override the problems arising from the untimeliness of the request.

Contrary to defendant's suggestion, this case is not in the same posture as cases where the trial court focused its inquiry on counsel's ineffectiveness while failing to adequately address the issue of delay. (See, e.g., *People v. Hernandez* (2006) 139 Cal.App.4th 101, 108-109; *People v. Munoz* (2006) 138 Cal.App.4th 860, 865, 869-870.) The record shows the court was aware that it was not conducting a *Marsden* hearing, and its repeated focus on the concern for delay of the trial reflected that it understood the need to balance delay concerns with defendant's reasons for new counsel.

Defendant asserts his request was not untimely, but rather was made as soon as he discovered his counsel was not prepared for trial. In support, he cites his statement to the trial court that he had a phone conversation with his counsel "just the other night." The mere fact that defendant may have spoken with his attorney a few nights before his discharge request does not show that defendant only then developed doubts about his counsel's performance. To the contrary, the record supports that defendant's claimed concerns arose at the August 15 hearing when he thought his counsel could not "out argue" the prosecutor, and/or at the September 10 readiness conference when counsel detected defendant's dissatisfaction with the plea bargain offer. Defendant did not

12

request to relieve his counsel at these proceedings, nor did he make the request at the September 13 pretrial hearing.

Moreover, the trial court was not required to find that defendant had a legitimate basis for believing his counsel was unprepared so as to outweigh the impact of a delay. Retained counsel told the court that she had prepared the case with defendant's assistance and she did not perceive any problems, and the court was entitled to credit these statements. The court's assessment is supported by the fact that defendant made essentially the same complaints about his first and second counsel, and that both his attorneys believed the core reason for his request for new counsel was his dissatisfaction with the plea bargain offers they had secured. The accuracy of this assessment is underscored by defendant's statements at the conclusion of the hearing on his request to discharge his retained counsel, when he told the court he would not be requesting a fourth attorney but only wanted one more chance to see if he could get a better plea bargain offer.

Defendant asserts that when denying his request to discharge retained counsel, the trial court improperly considered the need for the appointment of counsel based on his indigency. (See *People v. Ortiz, supra*, 51 Cal.3d at p. 987.) The contention is unavailing. There is no suggestion the court was concerned about the impact on the public purse if a public defender was appointed; rather the court was concerned about the delay in the trial arising from the appointment of new counsel.

Defendant's rights were not violated by the denial of his request to discharge his retained counsel.

13

## II. *Substantial Evidence of Specific Intent To Dissuade a Witness*

Defendant argues the record does not support two of his convictions for attempt to dissuade a witness because the evidence did not show that he had the specific intent to dissuade the victim from assisting with his prosecution. As noted, the witness dissuasion charges were based on three of defendant's recorded phone calls to the victim from jail after the domestic violence incident. He asserts that his conversations during the first and second recorded phone calls reflect that he merely wanted the victim to talk with his attorney for purposes of assisting with his defense. Defendant does not challenge his conviction based on the third phone conversation.

### A. *Background*

During the first phone conversation, defendant told the victim that the police report said he had "socked" her in the forehead and caused the injury, whereas she knew that he only pushed her which caused her to bump and cut her head. He claimed that she had accurately told the doctor at the hospital what happened, but when she talked to the police they twisted her words; they were "[bl]owing" the incident "all out of proportion"; and the incident was not "that serious." He explained to her that the case was more serious than she thought, and he was facing a 10-year prison sentence. He told her that *she did not have to cooperate with the district attorney*, and she could call his attorney and tell him that she was not "trying to do all this shit" and "just end this shit." He said she might have to go to court but *she did not have to "keep on working with this D.A. [to] convict"* him, and she should call his attorney to find out what she could do. (Italics added.)

14

During the second call, defendant reiterated essentially the same message, saying that he was facing a lengthy prison sentence, and what she told the doctor was correct but when she spoke to the police officer, she "started telling him all kind [of] other shit." He asked her to do him "this one last . . . favor" and *not send him to prison; she did not have to keep working with and testifying for the district attorney* who was trying to get him time in prison; and all she had to do was call his lawyer to see what she could do. He said it was obvious the police had put "extra shit" in their reports; the police and district attorney were working together to get him convicted; his lawyer was afraid of the district attorney and could not help him; and she was the only one who could get him "up out of this." He repeated that *she should not send him to prison*, and the incident was not serious. He said she might not "even be able to do too much because of everything [she had] already said" but at least his lawyer could tell her something she could possibly do. Defendant said he was "begging" her; he had her "back" and he needed her to have his back right now because he was "up against it"; and she should look out for him one last time and call his lawyer and talk to him.

During the third phone call, defendant told her she did not have to keep participating with the district attorney, and it was not "cool" that she would get up on the stand and testify against him and help lock him up. The victim told defendant she was not adding anything to the story; she was not taking anything out; and whatever she told the authorities was "for real."

15

## B. *Analysis*

The offense of witness dissuasion is committed when the defendant attempts to dissuade a witness from assisting with the prosecution of criminal charges, with the specific intent to influence the witness in this manner. (Pen. Code, § 136.1, subd. (b)(2); see *People v. Navarro* (2013) 212 Cal.App.4th 1336, 1347; *People v. McDaniel* (1994) 22 Cal.App.4th 278, 284.) In reviewing a challenge to the sufficiency of the evidence, we examine the entire record in the light most favorable to the judgment to determine whether there is substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) We presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*Ibid.*)

Based on the contents of the recorded conversations, the jury could reasonably find that defendant both wanted the victim to talk to his attorney to see if she could assist him, *and* he wanted her to stop cooperating with the prosecution of the charges against him. Defendant's repeated statements to the victim imploring her to stop working with the district attorney and not to send him to prison support that he did not want her to tell the truth, but rather he wanted her to try to figure out a way to minimize what occurred so that he could increase his chances of not being imprisoned for a lengthy time. Given this evidence, the jury was not required to find that defendant only wanted the victim to assist in his defense by calling his attorney.

The record supports that defendant had the specific intent to dissuade a witness from assisting with his prosecution.

16

## DISPOSITION

The judgment is affirmed.


                                                                    HALLER, J.


WE CONCUR:



BENKE, Acting P. J.



McINTYRE, J.

17