Filed 12/24/24  P. v. Guillen CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B320936 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA448771) |
| v. | |
| RAYMOND GUILLEN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed.

Stephen M. Vasil, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

A jury found defendant Raymond Guillen guilty of one count of murder (Pen. Code[1], § 187, subd. (a)), two counts of attempted willful, deliberate, and premeditated murder (attempted premeditated murder; §§ 664, 187, subd. (a)), and two counts of possession of a firearm by a convicted felon (§ 29800, subd. (a)(1)).[2]  On appeal, defendant challenges his conviction on four of these counts, contending that the trial court erred in making various evidentiary rulings.[3]  We affirm.

# II. BACKGROUND

## A. *Procedural History*

### 1. Amended Information

On October 18, 2021, the Los Angeles County District Attorney (District Attorney) filed an amended information charging defendant, Raul Saenz, and Anthony Jimenez with various crimes.  As relevant to the instant appeal, the information charged defendant with:  the murder of Raul Alaniz (count 1); the attempted premeditated murder of Luis Monreal

---

[1]    Further statutory references are to the Penal Code unless otherwise indicated.

[2]    Defendant was tried three times.

[3]    Defendant does not appeal his conviction on count 5, which charged him with possessing a gun as a convicted felon on a date two weeks after the charged murder and attempted murders.

(count 2); the attempted premeditated murder of Joe Diaz (count 3); possession of a firearm by a convicted felon (counts 4 and 5); and criminal street gang conspiracy (count 6; § 182.5). For counts 1 and 2, the District Attorney alleged that defendant personally and intentionally discharged a firearm, which caused great bodily injury or death to Alaniz and Monreal, within the meaning of section 12022.53, subdivisions (d) and (e)(1). For counts 1 through 3, the District Attorney alleged that defendant personally discharged and used a firearm within the meaning of section 12022.53, subdivisions (b), (c), and (e)(1), and that the offenses were committed for the benefit of a criminal street gang, within the meaning of section 186.22, subdivision (b)(1)(C). For counts 4 and 5, the District Attorney alleged a criminal street gang allegation pursuant to section 186.22, subdivision (b)(1)(A). For counts 1 through 6, the District Attorney alleged that defendant had two prior violent and serious felony convictions under the Three Strikes law (§§ 667, subds. (b)–(j), 1170.12) and section 667, subdivision (a)(1).

2.    First Two Trials

The case proceeded to jury trial on two prior occasions, resulting in a jury verdict of guilty on count 5, a true finding on the criminal street gang allegation for this count, and a dismissal of count 6. The court declared a mistrial on the remaining counts.

### 3. Third Trial

By the time of the third trial, Saenz and Jimenez had entered no contest pleas and defendant therefore proceeded to trial alone.

At the completion of the third trial, a jury found defendant guilty of counts 1 through 4. The jury also found true all the special allegations, except for the firearm allegations pursuant to section 12022.53, subdivisions (d) and (e)(1) for count 2. Defendant admitted the prior strike allegations.

### 4. Sentencing

On May 19, 2022, the trial court sentenced defendant to the low term of 16 months for counts 4 and 5, to be served concurrently to each other, but consecutively to the sentences for counts 1 through 3. The court dismissed the gang allegations. For counts 1 through 3, the court sentenced defendant to an aggregate term of 57 years to life.

## B. *Trial*

### 1. Prosecution's Case

#### a. Luis Monreal

Luis Monreal was a member of the White Fence criminal street gang which operated in Boyle Heights. The following people were also members of the White Fence gang: murder victim Raul Alaniz, attempted murder victim Joe Diaz,

defendant, codefendant Jimenez, and codefendant Saenz. Monreal, Diaz, and Alaniz were members of the Spiders clique of the White Fence gang. Defendant was a member of a different clique. Monreal and Alaniz were close friends. Monreal had known defendant since he was 12 years old, and the two men regularly hung out.

In 2016, members of the White Fence gang utilized an abandoned house located on Lorena Street in the Boyle Heights area as a "trap house," that is, for purposes of hanging out and selling drugs. Monreal, Alaniz, and Diaz regularly stayed in the trap house's garage, which was located at the back of the property. The occupants of the house at the front of the property were Jimenez, Jimenez's girlfriend Erica or Andrea Sandoval, and Margarita Marroquin, a White Fence member.

On July 11, 2016, Monreal was at the trap house with Alaniz, Diaz, Sandoval, Marroquin, and other gang members, when he was introduced to Jerry Lopez, another White Fence gang member. Lopez went to the trap house to "'clear his name'" with Alaniz. In 2014, Lopez told police that he was attacked by four or five White Fence gang members, which resulted in criminal charges being filed against six White Fence members.

Immediately before the shooting, Monreal was in the garage with Alaniz, Diaz, and another gang member, Raul Portugal. Monreal was ironing his clothes, Diaz was near the ironing board, and Alaniz was seated. Defendant arrived at the garage and ordered Portugal to leave. Portugal complied. Defendant then said something to Alaniz, who responded by shrugging and saying, "'I don't care.'"

Defendant reached into his jacket, pulled out a revolver, and shot Alaniz four times in the head. Defendant then turned

5

toward Monreal and Diaz and shot at them twice. Monreal was struck in his back and leg. Diaz ran into the back room of the garage and yelled at defendant to give him a break. Monreal threw the ironing board at defendant and ran toward the back room. Monreal saw Jimenez with a gun in his hand and believed that Jimenez fired a shot that struck Monreal's leg. Once he reached the room, Monreal closed the door and pushed a tool chest against the door to block the assailants' entry. The assailants kept shooting. Monreal kept quiet, hoping that the shooters would believe he was dead. Monreal heard codefendant Saenz say, "'Puro Cerco Blanco,'" meaning that "'just us'" White Fence members were present.

When it became quiet outside, Monreal opened the door and saw Alaniz slumped over in a chair. Monreal left the garage and walked to a nearby house. Monreal told the woman at that house that he had been shot and asked her to call for help.

b.      Margarita Marroquin

Marroquin was a White Fence member who lived at the trap house in 2016. At trial, Marroquin denied being familiar with defendant, discussing the shooting with Jimenez, or knowing anything about Alaniz's murder. She stated that she made prior statements to the police because officers made her an offer and she wanted to "just go and get high."

The prosecutor then played for the jury recordings of Marroquin's prior statements to the police. Marroquin told a detective that Alaniz "had it coming already" because he was involved in "really bad" things. Alaniz was viewed as a "snitch," who provided drugs to young girls in exchange for sex. In

Marroquin's view, three people should be arrested for Alaniz's murder: defendant, Jimenez, and Saenz.

In the recordings, Marroquin recalled that on the day of the shooting, defendant, Jimenez, and Saenz argued in Marroquin's room about Lopez's presence in the garage. Saenz had brought "a strap"[4] with him to the trap house and Marroquin saw two guns on the bed. The three men then walked out of the front house. Marroquin was on the couch in the living room when she heard gunshots.

Jimenez later told Marroquin that defendant shot Alaniz. Jimenez also admitted that he and defendant shot Monreal, Diaz, and another person.

### c.    Other Witnesses

Los Angeles Police Department Detective Stephanie Carrillo helped investigate the scene of the shooting. Police recovered seven cartridge cases, each of which was a .40 caliber Smith and Wesson. Six cartridges came from one gun, while the seventh came from another.

Los Angeles Police Department criminalist Kuang Siu testified about the bullets recovered from Alaniz's body. Two of the bullets were consistent with a "nine-millimeter Luger," a semiautomatic pistol. Another was consistent with "a .22 long rifle," and was commonly fired from handguns or pistols.

Saenz's sister, Sara Saenz, testified that she was under the influence of drugs during an earlier police interview, when she told the police that defendant had confessed to killing Alaniz. A

---

[4]    A police officer testified that a "strap" was a reference to a gun.

police officer testified that Sara Saenz did not appear to be intoxicated when she made her earlier statement about defendant's confession.

Los Angeles Police Department Officer Daniel Guevara testified that he was familiar with the White Fence gang. He identified the trap house as White Fence territory and knew defendant, Saenz, Jimenez, and Alaniz to be White Fence members. Guevara explained that under the Hispanic gang code, a member who provided information to law enforcement would be subject to retaliation by other members of the gang. A gang member who took advantage of young women by supplying them with drugs would also be subject to retaliation.

2. <u>Defense Case</u>

a. Defendant

Defendant testified that he was 55 years old at the time of the murder. Defendant "walked away" from the White Fence gang "a long time ago." Defendant admitted to having sustained a prior conviction in 1997 for heroin possession, which he claimed was his most recent conviction. He was released from prison in 2001 and "never went back to prison after that."

Defendant was "pretty good friends" with Alaniz and last saw him two weeks prior to his murder. Defendant denied being at the trap house on the day of the shooting, and did not know who lived at the house. Defendant denied shooting Alaniz, Monreal, or Diaz. He claimed to be at the park or a restaurant with Saenz at the time of the shooting.

Defendant had a close relationship with Monreal's wife and the two had an affair, which Monreal discovered. Monreal blamed defendant for the end of Monreal's marriage. Defendant believed that Monreal would shoot him, if possible, and had accused defendant of the shootings as an act of revenge.

On cross-examination, defendant admitted that at the time of his arrest, he was in possession of a gun, and that he was convicted of possession of a firearm by a convicted felon. He explained that he acquired the gun for protection even though he knew that, as a convicted felon, he could not legally possess a gun. Defendant learned that White Fence gang members blamed him for the murder and he was concerned about retaliation. But defendant did not attempt to clear his name with the gang. The prosecution introduced into evidence photographs of the gun and a magazine, which held at least 20 rounds.[5] Defendant denied knowing how to use the gun, and did not "even know if it fired." He assumed, though, that it worked.

Defendant admitted that he had White Fence gang tattoos as well as a tattoo of the word "Sur," meaning "Southern." Defendant acquired the "Sur" tattoo, which represented that defendant was from southern California, in prison. Defendant denied doing any acts on behalf of a prison gang. Defendant denied being an active member of any prison gang.

---

[5] Police found the gun and magazine at defendant's home.

### b. Martin Flores

Martin Flores testified as defendant's gang expert. Flores explained that a "Sur" tattoo had several meanings: it could signify being from a gang in southern California under the "Sureño umbrella" or it could signify being from a particular neighborhood. The tattoo did not necessarily mean that a person had "committed an act" to earn it.

### 3. Rebuttal

Los Angeles Police Department criminalist Daniel Rubin testified about the gun and magazine in defendant's possession at the time of his arrest. The gun was a functional nine-millimeter semiautomatic pistol. Two of the bullets recovered from Alaniz's body were of the same caliber as defendant's gun, but, based on ballistics testing, Rubin could not determine if they had been fired from that gun.

Los Angeles Police Department Officer Mario Morales testified as the prosecution's gang expert. He had known defendant for over 20 years and opined that defendant's "Sur" tattoo represented defendant's membership in Sureño, a gang. Morales described Alaniz and defendant as well-respected members of the Sureño gang.[6]

---

[6] We discuss Morales's rebuttal testimony further below.

# III.   DISCUSSION

## A.   *Admissibility of Co-Defendant's Out-of-Court Statements*

Defendant contends the trial court erred by admitting co-defendant Jimenez's out-of-court statements about defendant as a declaration against penal interest.  According to defendant, by pleading no contest to attempted murder, Jimenez waived his Fifth Amendment privilege against self-incrimination and therefore was not unavailable as a witness.  Defendant additionally contends that because Jimenez was no longer a codefendant in defendant's trial "he had to be called as a witness and assert the right."  Alternatively, defendant contends that his defense counsel provided ineffective assistance by failing to object on this ground.

### 1.   Background

On January 19, 2022, defense counsel moved to exclude that portion of Marroquin's recorded police interviews that included Jimenez's hearsay statements that defendant shot Alaniz and he and defendant shot Monreal, Diaz, and another person.  Counsel argued that Jimenez's statements, as recounted by Marroquin, were not trustworthy because Marroquin changed her story over time.

On January 20, 2022, the trial court conducted a hearing on the motion.  Defense counsel asserted that Marroquin's recitation of Jimenez's statements should "be excluded, not so much because it's not a statement against penal interest—it

11

doesn't even matter if it is—it's that Margarita Marroquin's statements changed so much over time . . . ."

At the continued hearing on January 24, 2022, the prosecutor argued that notwithstanding Jimenez's plea earlier that day, he remained "unavailable" because he still enjoyed a Fifth Amendment privilege against self-incrimination.[7] The trial court agreed.

On February 22, 2022, the trial court reiterated that Jimenez's out-of-court statements to Marroquin were a declaration against penal interest. The court reasoned that despite his plea of no contest, Jimenez remained unavailable to testify because Jimenez was still within the 60-day period in which he could file an appeal.

On February 23, 2022, counsel again moved to exclude Jimenez's statements. Defense counsel argued that the statements were inadmissible hearsay and not excepted as a declaration against penal interest because they "cannot be considered trustworthy."

On February 24, 2022, the trial court stated, "I've already ruled on this." The prosecutor argued that Jimenez's statements were against his penal interest and he remained unavailable to

---

[7] We grant defendant's request for judicial notice of Jimenez's no contest plea and the minute order, dated January 24, 2022, of that plea. (Evid. Code, §§ 452, subds. (a), (d), 453, 459.) Jimenez pled no contest to the attempted murder of Monreal and admitted that Monreal suffered great bodily injury pursuant to section 12022.7, subdivision (a). The court sentenced Jimenez to 12 years in prison. In exchange, the prosecution dismissed the remaining counts against Jimenez. The parties do not dispute that Jimenez exercised his right against self-incrimination during the criminal proceedings.

testify. Defense counsel responded, "Well, he's no longer—you know, he's no longer a person that has—you know, that it could be any longer against his penal interest." The court disagreed, stating: "Well, no. It's—you focus on when the statement is made, whether or not it's against the penal interest." The court subsequently denied the motion.

### 2. Applicable Law

"Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.) The exercise of the privilege against self-incrimination under the Fifth Amendment renders a witness unavailable. (*People v. Cudjo* (1993) 6 Cal.4th 585, 607; see Evid. Code, § 240, subd. (a)(1) [person is unavailable as a witness if he or she is "[e]xempted or precluded on the ground of privilege from testifying concerning the matter to which his or her statement is relevant"].) We review the trial court's evidentiary rulings for abuse of discretion. (*People v. Mataele* (2022) 13 Cal.5th 372, 413–414.)

### 3. Analysis

We reject defendant's argument that Jimenez was not unavailable as a witness because defendant forfeited his argument on appeal by failing to raise it below. (*People v.*

*Navarro* (2013) 212 Cal.App.4th 1336, 1347, fn. 9.)  Defendant moved to exclude Jimenez's statements on the grounds that *Marroquin's statements* were untrustworthy.  He did not argue that Jimenez was not unavailable as a witness.

We next consider defendant's alternative argument that his counsel was ineffective for failing to adequately raise his objection to Jimenez's statements below.  To establish ineffective assistance of counsel, "the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms.  Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different . . . ."  (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

There is no reasonable probability that, but for counsel's purportedly deficient performance, the outcome of the trial would have been different.  Even if the prosecutor had called Jimenez as a witness and Jimenez had waived his right against self-incrimination, Jimenez would have done one of two things.  Either he would have testified that his earlier statements to Marroquin were accurate, which would be harmful to defendant's case, or he would have denied making such statements, at which time the prosecutor could introduce his statements as a prior inconsistent statement.  (See Evid. Code, § 1235.)  In either event, the substance of Jimenez's prior statements would have been presented to the jury.  Accordingly, counsel's failure to require that Jimenez assert his Fifth Amendment privilege at trial does not constitute reversible error.  (*People v. Mai, supra,* 57 Cal.4th at p. 1009.)

B.      *Limiting Defendant's Testimony About Monreal*

Defendant next contends the trial court erred by limiting his testimony about the purported cause of Monreal's bias against him.  "[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence.  [Citations.]  Speaking more particularly, it examines for abuse of discretion a decision on admissibility that turns on the relevance of the evidence in question.  [Citations.]  That is because it so examines the underlying determination as to relevance itself.  [Citations.]  Evidence is relevant if it has any tendency in reason to prove a disputed material fact.  [Citation.]"  (*People v. Waidla* (2000) 22 Cal.4th 690, 717–718.)  "In examining defendant's claims, we keep in mind that we review the trial court's ruling, 'not the court's reasoning and, if the ruling was correct on any ground, we affirm.'  [Citations.]"  (*People v. Camacho* (2022) 14 Cal.5th 77, 123–124.)

1.      Background

During his second trial, defendant testified that he and Monreal had a "bad relationship."  Defendant had a friendship with Monreal's ex-wife Norma, who would call defendant to ask him to "diffuse the situation" when she and Monreal got into arguments.  Defendant further testified that Monreal was "very angry" about his friendship with Norma.  Defense counsel also attempted to elicit testimony that Monreal abused Norma.  The prosecutor objected to such testimony, and the trial court struck it.

15

At the third trial, defendant was questioned by defense counsel as follows:

"[Defense counsel]:  Okay.  Now, you mentioned that you knew [Monreal's] wife.  Would that be Norma?

"[Defendant]:  Yes.

"[Defense counsel]:  Okay.  And could you describe your relationship with Norma.

"[Defendant]:  I was probably more closer than—with her than I was with him, because I've known her for a long time, since junior high school.  She was having problems with in the years—in the '90s, where—

"[Prosecutor]:  Objection.

"[Defendant]:  —he was hitting her.

"[Prosecutor]:  Objection.  Speculation.

"The Court:  Sustained.  [¶]  And I'm going to strike that.

"[Defense counsel]:  Okay, so back in the '90s, did Norma ever call you up?

"[Defendant]:  Yes, she did.

"[Defense counsel]:  And for what purpose, if you know—if you recall, did she call you up?

"[Prosecutor]:  Objection.  Speculation.

"The Court:  Sustained.

"[Defense counsel]:  Did Norma—what did Norma say to you when she called you up back in the '90s?

"[Prosecutor]:  Objection.  Hearsay.

"The Court:  Sustained.

"[Defense counsel]:  Did you ever have a romantic affair with Norma?

"[Defendant]:  Maybe later in the years, yes I did.

16

"[Defense counsel]: And do you know whether [Monreal] became aware of that?

"[Defendant]: Yeah, he was well aware of it."

Defendant also testified that Monreal blamed him for the end of his marriage to Norma.

2. Analysis

Defendant argues that the trial court erred by excluding, on the grounds of speculation, his proffered testimony that Norma "had been having problems with Monreal . . . ."[8] According to defendant, he had personal knowledge of Monreal and Norma's marital issues because during the earlier trial, defendant testified that he would respond to Norma's telephone calls by "diffus[ing] the situation" when she and Monreal got into arguments. Defendant therefore contends the court erred in sustaining the prosecutor's objection on the grounds that defendant's testimony would be based on speculation. We find no abuse of discretion.

During the third trial, defendant sought to introduce into evidence Norma's statements to him about her marital problems. The trial court properly excluded the statements as hearsay. Defense counsel did not seek to lay a foundation, as she had in the second trial, for the basis of defendant's knowledge about

---

[8]     In his opening brief, defendant also argued the court erred by excluding his testimony that Monreal abused Norma. In his reply brief, defendant clarified that "what is at issue here is not the abuse itself but rather Monreal's anger at defendant for his intervening in his marital disputes on his [ex-]wife's behalf."

17

Norma's problems with Monreal. Thus, the court did not err in sustaining the prosecutor's objection for lack of foundation.

Defendant alternatively argues that counsel was ineffective for failing to lay an adequate foundation for defendant's knowledge about Monreal's marital problems. Even assuming for the sake of argument that counsel was ineffective in failing to lay a proper foundation, defendant cannot establish prejudice. Monreal's bias against defendant was relevant to demonstrate that Monreal had a motive to lie. The jury was already presented with evidence that Monreal harbored animus against defendant because of defendant's relationship with Norma and that Monreal blamed defendant for the breakdown of his marriage. It is not reasonably probable that defendant would have had a more favorable result had the jury learned that defendant also intervened in Monreal's marital disputes on Norma's behalf.

C.   *Cross-Examination of Defendant Regarding Underlying Conviction for Unlawful Possession of Firearm by Felon*

Defendant next contends the trial court erred by permitting the prosecutor to cross-examine him about the underlying facts of his prior conviction for unlawful possession of a firearm by a felon, as alleged in count 5 (for which defendant was convicted during the first trial). "Generally, an appellate court reviews a trial court's ruling on relevance or the propriety of cross-examination under the deferential abuse of discretion standard." (*People v. Howard* (2024) 104 Cal.App.5th 625, 653.)

18

1.    Background

Following defendant's testimony, and outside the presence of the jury, the prosecutor advised the trial court that he intended to impeach defendant with his prior conviction for possession of a firearm by a felon and the true finding that he possessed the gun for the benefit of a criminal street gang. The prosecutor argued that he should also be permitted to elicit testimony about the underlying facts of that conviction because defendant had testified that he was no longer a White Fence member and defendant's possession of a gun "would highly suggest that he is still and was still a member of that gang at the time." Defense counsel objected to the proffered cross-examination on the grounds that it would exceed the scope of direct examination and impeachment. The court permitted the prosecutor to inquire "with regard to the possession of the gun, certainly, and don't go too far afield[.]"

As we explain above, at trial, the prosecutor asked defendant about his earlier testimony that he had obtained the pistol for protection, asking, "can you tell us what type of pistol this is[?]" When defendant responded that he thought it was "a Glock—something like a nine-millimeter. I think it's a Mac," the prosecutor introduced a photograph of the gun and magazine. The prosecutor then asked defendant why, as an "inactive gang member," he had obtained a semiautomatic pistol a few days after the murder. Defendant responded he did so to protect his family and because he feared retaliation from the White Fence gang.

2.    Analysis

"'A prosecutor is permitted wide scope in the cross-examination of a criminal defendant who elects to take the stand.' [Citation.] 'When a defendant voluntarily testifies in his own defense the People may "fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them."' [Citation.] Generally, . . . 'A prosecutor may honestly urge that a defendant lied. Convincing the jury that he did so is a potent weapon.'" (*People v. Navarro* (2021) 12 Cal.5th 285, 333–334.)

According to defendant, cross-examination about his conviction for possession of a gun *after* the shooting occurred exceeded the scope of direct examination, since defense counsel never asked defendant about arming himself after the shooting. We disagree. First, defendant's possession of a gun two weeks after the murder raised a reasonable inference that he also possessed the gun at the time of the murder. Further, because defendant testified, his credibility could be impeached by evidence of a prior felony conviction. (Evid. Code, § 788.) Indeed, defendant testified that his last criminal conviction was in 1997. The prosecution therefore was entitled to impeach him with his far more recent conviction.

Defendant next argues the trial court erred by permitting the prosecutor to submit into evidence photographic exhibits of the gun and the gun's extended magazine because the admission of such evidence violated Evidence Code sections 1101 and 352. Defense counsel, however, never objected to the admission of

20

these exhibits as evidence. Defendant therefore has forfeited his argument on appeal. (*People v. Navarro, supra*, 212 Cal.App.4th at p. 1347, fn. 9.)

We disagree with defendant's alternative argument that defense counsel provided ineffective assistance by failing to object to the admission of the exhibits. Evidence Code section 1101, subdivision (a) provides that evidence of a person's character, including "evidence of specific instances of his or her conduct . . . is inadmissible when offered to prove his or her conduct on a specific occasion." But subdivision (c) of that section provides, "[n]othing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness." As we discuss above, defendant's possession of a gun was relevant to his credibility. And, evidence about his possession of a gun and magazine was not unduly prejudicial in a trial in which defendant was charged with murder. (*People v. Helzer* (2024) 15 Cal.5th 622, 667 [the "'undue prejudice' contemplated by Evidence Code section 352 "'is that which ""uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues."""""]; see also *People v. Dalton* (2019) 7 Cal.5th 166, 214 ["Evidence of circumstances underlying a conviction is admissible to impeach credibility if the proponent demonstrates that the evidence has 'any tendency in reason' to disprove credibility"].) Thus, counsel was not ineffective for failing to object to the cross-examination.

D.     *Rebuttal Evidence Regarding Gun*

Defendant next contends the trial court erred by allowing the prosecution to present rebuttal evidence about the details of

21

the gun that he possessed at the time of his arrest.  "The decision to admit rebuttal evidence rests largely within the discretion of the trial court and will not be disturbed on appeal in the absence of demonstrated abuse of that discretion.  (§ 1093, subd. (d); *People v. DeSantis* (1992) 2 Cal.4th 1198, 1232.)  In *People v. Carter*[ (1957)] 48 Cal.2d [737,] 753–754, we stated 'proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime.  It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt.'  Restrictions are imposed on rebuttal evidence (1) to ensure the presentation of evidence is orderly and avoids confusion of the jury; (2) to prevent the prosecution from unduly emphasizing the importance of certain evidence by introducing it at the end of the trial; and (3) to avoid 'unfair surprise' to the defendant from confrontation with crucial evidence late in the trial.  [Citations.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1199.)

> 1.    Background

Prior to rebuttal, the prosecutor sought permission to call police criminalist Rubin to testify that the gun found in defendant's possession was functional and two of the bullets recovered from Alaniz's body were of the same caliber as the gun, even though they "were just too mangled for them to be able to determine one way or another if it was a match."  Defense counsel argued that "it's already been determined that that gun was not a gun used in this shooting . . . ."  The prosecutor

22

disagreed with that assertion.  The trial court stated that "nobody really knew about the gun, until . . . defendant took the stand."  The prosecutor denied, however, that he was implying that the gun found in defendant's possession was used in the shooting.  Defense counsel again objected, stating that "[t]he only purpose this could possibly serve . . . would be innuendo, implication, and . . . [Evidence Code section] 352."

The trial court permitted the prosecutor's requested rebuttal, finding that whether the gun was operational was relevant to defendant's credibility.  The court also found that evidence about testing the gun was relevant and not unduly prejudicial.

### 2.    Analysis

Defendant asserts that evidence about the caliber of the gun did not impeach his earlier testimony because he never testified that the gun did not function—instead, he testified that he had not fired it and did not know whether it fired.  We disagree.  Defendant's testimony that he did not know if the gun was operational supported at least two inferences:  (1) defendant was so reluctant to shoot a gun that he did not do so even to determine whether the gun worked; and (2) because defendant had never fired the gun, he did not use it to shoot Alaniz.  The trial court therefore did not abuse its discretion when it allowed the prosecutor to rebut defendant's purported lack of knowledge about the gun's functionality—and inference that defendant had never fired the gun—with evidence that the gun was functional. (See *People v. Navarro, supra,* 12 Cal.5th at pp. 333–334.)

23

Defendant also argues that evidence about the caliber of the bullets was irrelevant. Again, we disagree. As noted, evidence about the two bullets was already introduced in the prosecutor's case-in-chief. A comparison of the bullets found in Alaniz's body with the gun found in defendant's possession was relevant to determine if it was the gun used to kill Alaniz. The fact that the test was inconclusive does not undermine the relevance of such evidence. Accordingly, we find the trial court did not abuse its discretion in admitting the rebuttal evidence here.[9]

E.    *Admission of Rebuttal Expert Testimony Regarding Prison Gangs*

Defendant also challenges the trial court's ruling that allowed the prosecution to introduce certain rebuttal expert testimony about prison gangs.

1.    Background

During rebuttal, the prosecutor posed a hypothetical to gang expert Morales, asking if a younger gang member would be sent to kill a well-respected gang member of the Sureños and White Fence gang. Morales opined that, rather than send a young gang member, a Hispanic gang would send a member

---

[9]    Defendant again alternatively argues that he received ineffective assistance from his counsel to the extent his challenge was not preserved on appeal. Because we addressed the issue on the merits, we need not discuss the merits of this alternative argument.

"with the same respect." When the prosecutor asked if a "Sureño gang member" in the prison system was required to follow the orders of the gang, Morales replied, "Yes, sir." The prosecutor then asked Morales: "And if they told you that you had to commit a certain type of crime, would that be expected of you?" Morales responded, "Yes." Defense counsel objected to the word "they."

At sidebar, the trial court asked whether the prosecutor's use of the term "they" was a reference to "the Mexican Mafia." The prosecutor confirmed that it was. The court indicated it would sustain the objection and require the prosecutor to define who "they" were. After some discussion among the parties and the court, the prosecutor agreed to "stay away from the Mexican Mafia" if defendant's objection was withdrawn, and if the objection remained, that the prosecutor would "just ask about the Mexican Mafia." Defense counsel agreed to withdraw the objection. Following the sidebar conference, the prosecutor completed direct examination without asking Morales any further questions.

2. <u>Analysis</u>

Defendant contends the trial court erred by admitting Morales's testimony on rebuttal because: "(1) it was a hypothetical not supported by the evidence; (2) the testimony was irrelevant, (3) assuming it was relevant, it constituted inadmissible propensity evidence, and (4) even if it had some relevance, it should have been excluded because it tended to confuse[ ] the issues, create undue prejudice, or mislead the jury."

25

We reject defendant's challenge on appeal because defendant has forfeited his argument by failing to object below. (*People v. Navarro, supra*, 212 Cal.App.4th at p. 1347, fn. 9.) Even if defendant had preserved his argument on appeal, we would reject it on the merits. First, we disagree with defendant's contention that "[t]here was no evidence presented at trial about the existence of so-called 'prison gangs,' let alone about how such prison gangs operate." Contrary to that assertion, defendant testified that he obtained the "Sur" tattoo while in prison but claimed that "Sur" signified defendant was from southern California. Defendant's gang expert, however, explained that "Sur" could signify being a member of a gang under the "Sureño umbrella."

We also reject defendant's contentions that the trial court erred in admitting evidence about prison gangs. "'Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.'" (*People v. Pineda* (2022) 13 Cal.5th 186, 233–234 [rejecting defendant's argument under Evid. Code, §§ 352, 1101 to exclude such evidence].) Moreover, defendant was charged with unlawfully possessing a firearm in furtherance of a criminal street gang. Thus, testimony about defendant's membership in the Sureños was probative of whether defendant committed the charged crimes and, if so, whether he did so for the benefit of a criminal street gang. Even assuming, however, that evidence of prison gangs was not otherwise relevant to the issues at trial, "[a] matter collateral to an issue in the action may

nevertheless be relevant to the credibility of a witness who presents evidence on an issue . . . ." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9; see also Evid. Code, § 780, subd (i).) Here, evidence about a prison gang was relevant because it impeached defendant's testimony that "Sur" was not a gang tattoo and he was not a member of a prison gang.[10]

Finally, we conclude that evidence about prison gangs was not unduly prejudicial. (See *People v. Valdez* (2012) 55 Cal.4th 82, 128, 131, 134 [rejecting defendant's claims that evidence of defendant's gang affiliation, including photographs of defendant's gang tattoos and gang members brandishing weapons, violated Evid. Code, §§ 352 and 1101]; see also *People v. Vang* (2011) 52 Cal.4th 1038, 1052 [expert may express opinion on whether crime was gang-related].)

F.     *Due Process*

We next consider defendant's contention that the trial court's purported errors in admitting and excluding evidence violated his due process rights. "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*. (*Estelle v. McGuire* (1991) 502 U.S. 62, 70; *Spencer v. Texas* (1967) 385 U.S. 554, 563–564; *People v. Falsetta* (1999) 21 Cal.4th 903, 913 ['The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's

---

[10]     Because we conclude that the court did not abuse its discretion in allowing the challenged rebuttal evidence, we need not consider defendant's alternative argument that his counsel was ineffective in failing to object to the evidence.

27

trial fundamentally unfair']; see also *Duncan v. Henry* [(1995)] 513 U.S. [364,] 366.)" (*People v. Partida* (2005) 37 Cal.4th 428, 439.) We have concluded that the court did not abuse its discretion in making the challenged evidentiary rulings. We also conclude that defendant's trial was not fundamentally unfair. We therefore find no due process violation.

G.      *Cumulative Error*

Finally, defendant contends that the cumulative effect of the above alleged errors also violated his due process rights. "In examining a claim of cumulative error, the critical question is whether defendant received due process and a fair trial. (*People v. Cain* (1995) 10 Cal.4th 1, 82.) A predicate to a claim of cumulative error is a finding of error. There can be no cumulative error if the challenged rulings were not erroneous. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1382 [no cumulative error where court 'rejected nearly all of defendant's assignments of error'].)" (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) We find no cumulative error here.

## IV.   DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM (D.), J.

We concur:

HOFFSTADT, P. J.

BAKER, J.